J-A19009-20

2020 PA Super 286

| | | |
|---|---|---|
| Z.F.1 AND Z.F.2, AS MINORS, BY AND THROUGH THEIR PARENT AND NATURAL GUARDIAN, [V.B.] | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| BETHANNA, WAYNE AND ROSELLA KEENY (H/W), DEFENDER ASSOCIATION OF PHILADELPHIA, ROGER KIMBER, JR., M.D. AND WELSH MOUNTAIN HEALTH CENTERS D/B/A MEADOW CREEK FAMILY PRACTICE | : : : : : : : : : : : | No. 1425 EDA 2019 |
| APPEAL OF: DEFENDER ASSOCIATION OF PHILADELPHIA | : : : | |

Appeal from the Judgment Entered March 29, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  July Term, 2017 No. 02958

BEFORE:  PANELLA, P.J., McLAUGHLIN, J., and McCAFFERY, J.

OPINION BY McLAUGHLIN, J.:                  **FILED DECEMBER 16, 2020**

The Defender Association of Philadelphia ("Defender Association") appeals from the judgment entered against it and in favor of Z.F.1 and Z.F.2 ("Children" or "Plaintiffs"), by and through their parent and natural guardian, V.B. ("Father"). The Defender Association claims that it is immune as a matter of law from suit, Plaintiffs failed to prove that it breached a standard of care or caused damages, the court erred in evidentiary rulings, and the court erroneously denied remittitur. We affirm.

Plaintiffs filed this action in June 2016, seeking damages for abuse Children allegedly suffered while Children lived in their foster parents' home. Trial Court Opinion, filed Aug. 2, 2019, at 2("1925(a) Op."). They brought the action against "an agency that certifies and oversees foster homes," Bethanna, and Children's foster parents, Wayne and Rosella Keeny ("foster parents"). *Id.* Subsequently, in July 2017, Plaintiffs filed a separate action naming the Defender Association as a defendant,[1] and the trial court consolidated the cases.[2] The Defender Association filed an Answer and New Matter and asserted in New Matter, "Answering Defendants incorporate by reference all affirmative defenses according to the Pennsylvania Rules of Civil Procedure 1030(a)." Defender Association's Answer, filed Oct. 18, 2017, at ¶ 126. One of the defenses listed in Rule 1030(a) is "immunity from suit." Pa.R.C.P. 1030(a). However, the Defender Association did not file any pretrial motion, such as a motion for summary judgment, seeking dismissal based on any claim of immunity.

Plaintiffs settled with Bethanna prior to trial, and the case against the Keenys and the Defender Association proceeded to a jury trial.

---

[1] This Complaint also included claims against Roger Kimber, Jr., M.D., and Welsh Mountain Health Centers. Plaintiffs dismissed the claims against Dr. Kimber and Welsh Mountain Health Centers prior to trial.

[2] The trial court consolidated the cases for purposes of discovery and trial only. For that reason, and because the Defender Association was a party to the second case only, its filing a single notice of appeal from the judgment in the second case does not violate *Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018).

The trial court set forth the following factual history:

ZF1 and ZF2 are twin siblings. Their biological mother was unable to provide parental supervision and services, thus [C]hildren were declared dependent and placed in the foster care system in April of 2011. On April 29, 2011, the Child Advocacy Unit of the Defender Association was named counsel and guardian *ad litem* of [C]hildren. Bethanna, an agency that certifies and oversees foster homes, placed [C]hildren with foster parents Wayne and Rosella Keeny, who lived in Lancaster, on August 24, 2011. At this time, [C]hildren were seventeen months old. While [C]hildren were living with the Keenys, and after roughly three years of being in the foster care system, the goal for [C]hildren became adoption. In reference to the process and timing of adoption, Shereen Arthur White, Esquire (Defender Association Attorney White)[2] testified at trial that "the law requires that after a certain time you have to kind of move them forward so they don't linger in the system." The Keenys were viewed as the prospective adoptive parents. In September of 2013, while [C]hildren were in the care of the Keenys, the Department of Human Services (DHS) contacted [Father] to inform him that he may be the father of [C]hildren.[3] [Father] took a paternity test, the results of which were presented at a dependency hearing in January of 2014. The results established [Father] as the biological father of [C]hildren.

> [2] Defender Association Attorney White was a child advocate attorney for the Defender Association. Defender Association Attorney White was assigned to work on [C]hildren's case around the time that the Defender Association received the case.

> [3] Information regarding the ordering of the paternity test and the process of contacting [Father] regarding the paternity test were never discussed on the record. This information was only discussed in the pleadings, which do not cite to any source.

[Father] appeared in court for the first time in January 2014. His paternity having been confirmed, [Father] requested visitation rights with his children. He was given permission to start with supervised visits. After having spent time with

[C]hildren, [Father] informed DHS, his attorney Daniel Kurland, Esquire, and [C]hildren's Bethanna caseworker, Ms. Katie Herrmann, that he suspected abuse in the Keeny home. On multiple occasions, [Father] expressed concerns that [C]hildren were being spanked and that ZF1 was made to sit on the floor with her panties off. Ms. Herrmann told [Father] that she would check out the allegations of abuse and report back to him. Ms. Herrmann reported back that she could not find any proof that abuse was happening. [Father] again raised concerns of abuse of both children at a dependency hearing on May 29, 2014. Defender Association Attorney White and a Bethanna agency worker[] were both present at this dependency hearing. In her testimony, Defender Association Attorney White asserted that "the agency worker from Bethanna" (whom she did not name) reported, "the Keenys do not spank or physically discipline ZF1 and ZF2. I was told that they physically discipline their biological son, but not ZF1 and ZF2."

Defender Association Attorney White testified that her general role as a child advocate attorney was to represent the best interests of the child. One of her specific roles was to gain, gather, and solicit facts about each of her cases. As mentioned above, at the May 29, 2014 dependency hearing, [Father] raised concerns that [C]hildren were being spanked as well as a concern that ZF1 was being made to sit on the floor without her underwear.

[The following portion of the May 2014 transcript, where the DHS social worker stated that Father expressed concerns about the foster parents, was read to Attorney Williams during the trial:

> He said that he felt that the kids were being spanked in the foster home because during one of the visits – and he's here to testify to that -- they asked the children something . . . about their bottom. And one of the kids reported: "I sit on the floor with my panties down, or something, and then they said something else."

N.T., 11/19/18, at 49-50.]

At trial, attorney for [P]laintiffs asked [Attorney White], "Can we agree that nowhere in that May 29, 2014 transcript do you follow up with any questions about the child being

- 4 -

made to sit on the floor with her panties down or do any of the things that you suggested to this Court and this jury that you would have done if you had heard such an allegation?"[5] In response, Defender Association Attorney White stated, "I can tell you that in that transcript there's nothing about me following up, but my work goes way beyond a transcript in a court hearing." Defender Association Attorney White then confirmed that an allegation such as the one made at the May 29, 2014 hearing regarding ZF1 being made to sit on the floor without her panties would warrant immediate removal and investigation. She further confirmed that she did not request that ZF1 be removed from the home at the May 29, 2014 dependency hearing nor at any time thereafter, prior to the removal of [C]hildren from the Keeny home in May of 2015.

> [5] Defender Association Attorney White had testified that, if she had become aware of an allegation or involving concern ZF1 [was] being made to sit on the floor without her underwear in front of Mr. Keeny, "I would have gotten it before the judge. I would have asked to remove. I would have asked for further investigation. I would have asked to get her out of there while we figure out what's going on."

In May of 2015, after [Father] raised additional concerns of abuse, Bethanna sent caseworker Marissa Morris to visit the Keenys' home for further investigation. At trial, Mrs. Keeny confirmed that, during this visit, Marissa Morris took [C]hildren separately and inquired of [C]hildren whether they were being spanked or hit. Mrs. Keeny also acknowledged that it was during this visit that it actually came to light that the Keenys had spanked [C]hildren.

On May 13, 2015, Ms. Katie Herrmann, the Bethanna caseworker who had been assigned to [C]hildren's case since January of 2014, reported to Defender Association Attorney White that the Keenys had confirmed their use of physical discipline on [C]hildren. The Bethanna foster care rules forbid corporal punishment of foster children. Defender Association Attorney White requested that [C]hildren be moved out of the home immediately. Bethanna initially attempted instead to implement a "plan of correction", which entailed reprimanding the Keenys and allowing [C]hildren to remain in the Keeny home. However, Defender

Association Attorney White emailed Bethanna caseworker Marissa Morris on May 13, 2015, stating that a plan of correction was an insufficient remedy for the alleged issue at hand. Defender Association Attorney White stated that her clients, ZF1 and ZF2, must be moved to respite on that date. At trial, Mrs. Keeny confirmed that after she admitted to having spanked [C]hildren, they were removed from the Keeny[s'] home. In early June of 2015, Colleen Swim, Esquire (Attorney Swim) succeeded Defender Association Attorney White as the Defender Association Child Advocate Attorney for [C]hildren.

According to the Child Protective Services Investigation Report from November 20, 2015, ZF1 made "consistent and credible disclosures of sexual abuse".[6] The report also noted, in reference to ZF1, the "child reported that AP[7] inserted his finger in her vagina, in parentheses hiney, and anus, in parentheses butt, and it caused pain". ZF1 reported that this had happened on more than one occasion. On November 24, 2015, ZF1 and ZF2 disclosed to Bethanna caseworker Natasha Yoder that Rosella and Wayne Keeny had sexually molested them and that Wayne Keeny put his hand in their bottom. In November of 2015, Bethanna sent Attorney Swim an email which alerted her to the fact that ZF1 and ZF2 disclosed that they were sexually abused in the Keeny home.[8]

> [6] Video interviews of [C]hildren were played for the jury on the first day of trial to avoid putting [C]hildren on the stand.
>
> [7] It was never clarified on the record what "AP" signifies.
>
> [8] Ms. Swim stated that she did nothing about the email because [C]hildren were in therapy at the time she received the email.

On December 5, 2016, [C]hildren moved in [Father]. [Father] testified that "ZF1 and ZF2 both wet the bed" when they first came to live with him. He also stated that ZF1 had "anger issues at times, which occurs to this day. She often goes into blank stares, biting her nails, but – she's happy." When asked if ZF1 exhibited any other behavioral issues, [Father] said, "Yes. She actually - touches herself'; [Father] clarified that he was referring to ZF1 touching herself in

private areas. He also testified, "[A]t my sister's home before we moved, she had a couple occasions where she smeared her poop on the bathroom wall." When asked about ZF2, [Father] explained, "He's quiet, you know. He's happy as well, but he bites his nails. He pulls his hair out."

Wayne Keeny admitted to having spanked both ZF1 and ZF2, but denied any other type of hitting by himself or Rosella Keeny. Both Wayne and Rosella Keeny denied all allegations of sexual abuse. Wayne Keeny admitted to having used corporal punishment with [C]hildren, even though he was aware that this was not allowed under the foster care agreement with Bethanna. Rosella Keeny admitted to having spanked [C]hildren with her hand or a wooden spoon. Rosella Keeny also admitted to having used a wooden ruler on the hands of [C]hildren one time. At trial, Rosella Keeny provided her perspective regarding the time ZF1 stated that she was made to sit on the floor with no underwear. She stated that ZF1 was wound up before bed and Wayne Keeny asked her to sit on the floor in front of him as a time-out, to calm her down. Mrs. Keeny added that she later noticed ZF1's tights and underwear on the floor, but stated that ZF1 was covered by her long dress and thus was not exposed.

Ms. Erica Cook, a social service advocate for the Defender Association, had been assigned to [C]hildren's case in 2013. Ms. Cook testified that she never visited [C]hildren while they lived in the Keeny home, never attended a hearing for ZF1 or ZF2, nor did she ever meet Rosella or Wayne Keeny.[9] Ms. Cook testified that she was not aware of any concerns about [C]hildren being mistreated in the Keeny home until May of 2015. Ms. Cook agreed that, as a social service advocate, she would want to be made aware of any allegations that a child was being mistreated.

[9] Defender Association Attorney White had testified, however, that "typically social workers would do all the home visits", and that she herself attempted to partake in home visits for her cases. Defender Association Attorney White confirmed that there were times when social workers saw her clients.

1925(a) Op. at 2-7 (citations to record omitted).

- 7 -

Both Plaintiffs and the Defender Association presented expert testimony at trial. Plaintiffs called Dr. Robin A. Altman, M.D. to provide expert testimony about child psychiatry, psychiatry, and placement agencies and to testify that Bethanna breached the standard of care for a child welfare agency. She also said that Z.F.1 suffered from post-traumatic stress disorder ("PTSD") and disassociation related to trauma. She testified that she believed Children were abused in the Keeny household. The trial court summarized her testimony as follows:

> Dr. Altman stated that someone should have spoken to [C]hildren alone and investigated further into the allegations of abuse raised by [Father]. Additionally, Dr. Altman stated that she believed ZF1 suffered from posttraumatic stress disorder, also known as PTSD. Dr. Altman testified that she believed ZF1 was suffering from disassociation related to trauma. When asked whether she had an opinion as to whether ZF1 and ZF2 were abused in the Keeny household, Dr. Altman responded, "Yes. I believe they were." Dr. Altman also testified that she believed, based on evidence of fecal smearing, that ZF1 was sexually abused in the Keeny household.

*Id.* at 8 (citations to record omitted).

For its part, the Defender Association called Dr. Annie Steinberg, M.D., to testify as an expert in pediatrics and child psychiatry. She opined that Children's symptoms were related to their six moves to different homes at a young age:

> Dr. Steinberg stated that any child who is moved to six different homes at such a young age would experience similar issues and exhibit similar symptoms to those of ZF1 and ZF2. Dr. Steinberg opined that Dr. Altman did not spend

enough time with ZF1 and ZF2 to properly conclude that they each suffer from posttraumatic stress disorder.

*Id.*

Dr. Steinberg testified that she did not believe that Children had PTSD, and when she gave her basis for that opinion, Plaintiffs objected that she was not offering her own opinion, but rather "bootstrapping" other doctors' opinions. The trial court sustained the objection:

> **A.** At the current time, I do not believe they have posttraumatic stress disorder.
>
> **Q.** And why do you believe that?
>
> **A.** Because the treatment providers that saw them for the longest period of time at Joseph J. Peters Institute in Philadelphia got to know them very well, worked with the father, worked with the last foster parent before transition to the biological family. And over many months of working with [C]hildren, their father and initially the last foster parent did not believe that they met the criteria for that diagnosis.
>
> **MR. BEZAR**: Objection; motion to strike.
>
> **THE COURT**: I'll see counsel.
>
> **MR. BEZAR**: Your Honor, the witness is bootstrapping other physicians' opinions. I wasn't sure where she was going to go. She started to say the people that had seen them. I thought she was going to say they reported certain clinical symptoms, which she's allowed to suggest and a few other things. But all of the sudden, she just bootstrapped someone else's opinions to form -- to support her or to suggest her own.
>
> **MR. DOYLE**: Any medical expert can use the treatment records of the patient to formulate their opinion and the basis for their opinion.
>
> **MR. BEZAR**: Absolutely.

**MR. DOYLE**: It includes treatment records by other people in her field.

**MR. BEZAR**: Agreed.

**MR. DOYLE**: And she relied upon that to formulate her opinions in part. And I think it's very proper for her to comment on medical records she reviewed. They were clearly listed in her report. She clearly offered this opinion.

. . .

**MR. DOYLE**: She clearly offered this opinion. She clearly indicated that she had reviewed these records and what they showed and why they were important to her.

**MR. BEZAR**: Absolutely, she's allowed to review those records. But she's not allowed to bootstrap her opinion with the opinions of others. She's allowed to use the basic data, and that is --

**THE COURT**: It will be stricken.

N.T., 11/20/18, at 303-305. The court also struck another portion of Dr. Steinberg's testimony where she repeated other practitioners' findings.

Plaintiffs also presented the testimony of an expert in dependency court matters, Karen Deanna Williams, Esquire. She testified, among other things, about the standard of care of a child advocate and a guardian *ad litem*. The trial court gave this summary of her testimony:

> [Williams] testified that, in her opinion, the Defender Association failed to comply with the appropriate standard of care in regards to their handling of [C]hildren. Specifically, Expert Witness Attorney Williams testified that the allegations about a foster child sitting on the floor with her panties down should have been sufficient to trigger further investigation on the part of the child advocate. She noted that the child advocate from the Defender Association had been made aware of the allegations that ZF1 was made to sit on the floor with her panties down at the May 29, 2014 dependency hearing, but that the child advocate failed to

> pursue any further investigation or raise any questions after this allegation was made. In response to [P]laintiffs' attorney's questioning on direct examination, Expert Witness Attorney Williams opined that the Defender Association's failure to take adequate care was a "but for" cause of the harm to ZF1 and ZF2.

1925(a) Op. at 8-9 (citations to record omitted).

Williams' testimony took place on two non-consecutive days, Thursday, November 15, 2018, and Monday, November 19, 2018. On November 15, she testified about a delay in reunification with Father and gave an opinion that the Defender Association breached the standard of care by failing to obtain medical records. N.T, 11/15/18, at 176-77. After this testimony, but before Williams' subsequent testimony on November 19, Plaintiffs withdrew their claim that the Defender Association had breached the standard of care by failing to obtain medical records. They also withdrew the claim premised on a delay in reunification. N.T., 11/19/18, at 69.

However, when Williams returned to the stand on November 19, the Defender Association proceeded to cross-examine her about Children's medical records. *Id.* at 68. Plaintiffs objected and explained at sidebar that they had withdrawn the medical records claim. They argued that the Defender Association's questioning of Williams risked that she would "blurt out something that she is unaware that she is not to blurt out." *Id.* at 69. The Defender Association responded that Plaintiffs needed to tell the jury that they had withdrawn the issue, and Plaintiffs agreed to tell the jury that "not getting the records is not a breach in the standard of care." *Id.* at 72. Plaintiffs then argued that questioning Williams about the records was no longer relevant.

The Defender Association replied that it only wanted to ask her if the Children's doctor was a mandatory reporter of child abuse, as a predicate to asking her if, after the hearing at which the statement about Z.F.1 sitting on the floor with no underwear came out, the physician had found any abuse. *Id.* at 75. The court responded that the Defender Association could "ask those questions, and that's the end of it. . . ." *Id.* at 76.

At the close of Williams' testimony, the Defender Association asked the court to strike Williams' testimony about the withdrawn theories. *Id.* at 90-91. The following morning, the parties and the court discussed a cautionary instruction, and the court asked the parties to agree on wording for such an instruction. N.T., 11/20/18, at 7-10.

The Defender Association presented its own expert in the practice of law, professional responsibility, and the duties of a child advocate and a guardian *ad litem*, Samuel Stretton, Esquire. He found the Defender Association did not fail in its responsibilities:

> In preparing his expert report, Attorney Stretton reviewed [P]laintiffs' complaint, [P]laintiffs' Bethanna file, [P]laintiffs' Defender Association file, the dependency court transcripts, the deposition transcript of Defender Association Attorney White, and the deposition transcript of Attorney Swim. With regards to the Defender Association's standard of care, Attorney Stretton testified, "there was nothing I saw that indicated the Defenders failed in their responsibilities of regular review, checking in with social workers, appearing at hearings. And as soon as they became aware of a problem, they immediately . . . requested [C]hildren be pulled."

1925(a) Op. at 9 (citations to record omitted).

The Defender Association directed Stretton's attention to testimony at the May 29, 2014 dependency hearing regarding the incident where Z.F.1 was made to sit on the floor without her panties, and asked him if he had an opinion about whether Defender Association Attorney White's "representation in total at that hearing" met the standard of care. N.T, 11/20/18, at 104-05. Plaintiffs objected and they argued at sidebar that the response would be beyond the scope of Stretton's expert report. *Id.* at 105. Stretton's report did not mention that the social worker had said at the May 2014 hearing that Z.F.1 had reported that she sat on the floor without underwear. Stretton's expert report did say he had reviewed the transcript, and it included the following opinion:

> My opinion, within reasonable legal and ethical certainty, is that the Defender Association of Philadelphia, as child advocate and guardian *ad litem*, fulfilled its common law and fiduciary obligations of these two minor children, Z.F.1 and Z.F.2, at all pertinent times. In my review of the record, there were multiple court hearings where the well-being of [C]hildren was discussed.

*Id.* at 115. The trial court sustained the objection.

After the close of evidence, the Defender Association informed the court that the parties were unable to agree on a cautionary instruction regarding the withdrawn theories. They therefore renewed their motion to strike Williams' testimony about those theories. The court denied the motion. N.T, 11/21/18, at 30-31. During closing argument, Plaintiffs informed the jury that they had withdrawn the medical records and reunification claims:

> This is not a case about the Child Advocate Unit not getting medical records or a delay in unification with [Father]. This is a case about an attorney that served both as a courtroom advocate and as a guardian *ad litem*, an attorney that was required to protect the best interest of a child and failed to do so by soliciting testimony about things that were raised during the May 29, 2014 hearing.

*Id.* at 45. Plaintiffs then focused their argument on the sole remaining negligence theory against the Defender Association, and did not argue for a verdict based on either of the withdrawn theories.

The jury found in favor of Plaintiffs, and against the Defender Association and the Keenys. It awarded damages of $2.5 million to Z.F.1 and $2.0 million to Z.F.2. When it apportioned liability, it found the Defender Association 55% liable, Bethanna 20% liable, Wayne Keeny 20% liable, and Rosella Keeny 5% liable.

The Defender Association filed post-trial motions, including a motion for judgment notwithstanding the verdict ("JNOV") arguing Plaintiffs had failed to present a *prima facie* case. It also sought a new trial based on allegedly improper evidentiary rulings, and requested remittitur or reduction of the damages. The Defender Association then filed a supplemental post-trial motion, claiming it was entitled to JNOV "based upon a qualified sovereign immunity." The trial court denied the post-trial motions, and the Defender Association filed a timely Notice of Appeal.

The Defender Association raises the following issues:

> 1. Is the Defender Association immune from suit while serving the court in the capacity of a guardian *ad litem*, and is the issue reviewable or was it waived?

2. Did the Defender Association commit legal malpractice in handling vague allegations of spanking by foster parents when they first surfaced at a 2014 court hearing or thereafter in light of express denials of spanking by the foster parents and [C]hildren at the time, a total lack of any corroborating evidence, and a judicial ruling that the allegations did not raise concerns about the safety of [C]hildren?

3. Was the conduct of the Defender Association during or after the 2014 dependency hearing causally related to harm suffered by [C]hildren?

4. Did the trial court improperly permit the jury to consider, over numerous timely objections, prejudicial and irrelevant testimony by [Plaintiffs'] expert relating to theories of liability against the Defender Association that [Plaintiffs] subsequently abandoned at trial?

5. Did the trial court improperly prevent the Defender Association from presenting expert testimony on the element of the standard of care in a legal malpractice case?

6. Did the trial court improperly prevent the Defender Association from presenting expert medical testimony on the issue of whether [C]hildren were suffering post - traumatic stress disorder ("PTSD")?

7. Should the trial court have remitted the excessive amount of the jury award and the grossly disproportionate share of fault the jury imposed upon the Defender Association?

Defender's Br. at 8-12 ("Question Presented:" omitted).

## A. Immunity

In its first issue, the Defender Association claims it is immune from suit because the suit arose from actions taken while one of its attorneys was acting as a guardian *ad litem*, and disputes that the claim against it was for legal malpractice. It is uncertain of the immunity it claims, stating it is eligible for "judicial and/or quasi-judicial immunity." Defender's Br. at 43. It claims it did

not waive the issue because it asserted immunity as an affirmative defense in its Answer to the Complaint and re-raised the issue in its supplemental post-trial motion.

Ordinarily, a party waives appellate review of any issue it did not properly preserve below. **See generally** Pa.R.A.P. 302(a). However, some issues are non-waivable, and the Defender Association likens its claimed immunity to local governmental immunity, which is nonwaivable. **See** Defender's Reply Br. at 7 (citing **Taylor v. Phila.**, 692 A.2d 308, 313 (Pa.Cmwlth. 1997), *aff'd*, 699 A.2d 730 (Pa. 1997)). It also suggests that its claim is for absolute immunity and therefore not subject to waiver. **See id.** (citing **In re XYP**, 567 A.2d 1036, 1039 (Pa. 1989); **Guarrasi v. Scott**, 25 A.3d 394, 405 n.11 (Pa.Cmwlth. 2011).

We do not need to reach the question of waiver because the Defender Association is asking us to establish a new immunity, which is not for us to do. Although it contends we would not be creating new law, but rather extending existing principles, we disagree. The Defender Association concedes that it has not cited any existing Pennsylvania statute, rule, or case law establishing that a guardian *ad litem* enjoys immunity. It instead cites cases from other states and statements in a federal decision to make what are fundamentally policy arguments that we should extend immunity to it.

But it is not the institutional role of the Superior Court to make such policy decisions. Rather, the Superior Court is an error-correcting court and we leave policy questions to the Supreme Court and the General Assembly.

*Matter of M.P.*, 204 A.3d 976, 986 (Pa.Super. 2019). "It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines." *Id.* To do as the Defender Association asks, rather than applying existing rules, we would have to import them into a novel context where they do not have obvious application. We therefore decline the invitation to create an immunity for guardians *ad litem* and reject the Defender Association's first issue.

## B. Judgment Not Withstanding the Verdict

The Defender Association's next two claims argue the court erred in denying its motion for JNOV.

> [T]he standard of review for an order granting or denying judgment notwithstanding the verdict is whether there was sufficient competent evidence to sustain the verdict. We must view the evidence in the light most favorable to the verdict winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. Furthermore, judgment nov should be entered only in a clear case, where the evidence is such that no reasonable minds could disagree that the moving party is entitled to relief. Review of the denial of judgment nov has two parts, one factual and one legal:
>
> > Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded evidence at trial, we will not substitute our judgment for that of the finder of fact.

*Underwood ex rel. Underwood v. Wind*, 954 A.2d 1199, 1206 (Pa.Super. 2008) (quoting *N.E. Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.*, 933 A.2d 664, 668 (Pa.Super. 2007)).

"To prevail in any negligence action, the plaintiff must establish the following elements: the defendant owed him or her a duty; the defendant breached the duty; the plaintiff suffered actual harm; and a causal relationship existed between the breach of duty and the harm." ***Merlini v. Gallitzin Water Auth.***, 934 A.2d 100, 104 (Pa.Super. 2007) (citing ***Freed v. Geisinger Med. Ctr.***, 910 A.2d 68, 72–73 (Pa.Super. 2006)).

### 1. Breach of Standard of Care

The Defender Association claims the evidence did not establish that it breached a duty of care to Children. It claims that at the 2014 hearing, a social worker testified that Father informed her that one of the children said that she "sit[s] on the floor with [her] panties down." Defender's Br. at 44 (citation omitted). It argues that Father did not testify at the hearing that he had any suspicions of sex abuse, and that Father's counsel spoke only of "corporal punishment." ***Id.*** at 45. It further notes that the allegations of spanking were addressed at the hearing. The Defender Association states that it supported Father's request for more visitation, "thereby help[ing] to provide [C]hildren with precisely what they needed: another set of eyes looking after them and ears listening to them." ***Id.*** at 44.

The Defender Association also claims that Father's counsel "misrepresented" at trial the statement attributed to Z.F.1. ***Id.*** at 46. The Defender Association claims that the alleged misrepresentation – that Z.F.1 "was made" to sit on the floor without her underwear "in front of" foster father – is "significantly different" from what it contends is the "correct" version of

the statement – that Z.F.1 "sit[s] on the floor with [her] panties down." *Id.* at 46-47. The Defender Association maintains that because Plaintiffs' counsel repeated the misstatement during direct examination of Williams, Plaintiffs' expert on the standard of care, Williams' opinion is based on "inaccurate facts" and is "incurably corrupted." *Id.* at 48. The Defender Association concludes that "the only reliable evidence" on this issue was testimony it presented "that it conducted appropriate follow up at the May 29, 2014 hearing to determine if [C]hildren were being subjected to any corporal punishment." *Id.*

The trial court concluded that Plaintiffs presented sufficient evidence of a breach of the standard of care:

> In the case at hand, the Defender Association was assigned to represent both the legal interests and the best interest of ZF1 and ZF2. The [P]laintiffs' claim of professional negligence asserts that the Defender Association breached their duty of care in regards to the legal interests of ZF1 and ZF2. The twelve jurors applied the law to the facts of the case and all twelve jurors found that the Defender Association's conduct satisfied all three elements of a claim of professional negligence. N.T. 11/21/18 at 161-62. As the party representing [C]hildren's legal interests, the Defender Association owed a duty of care to ZF1 and ZF2. The testimony presented by Expert Witness Attorney Williams provided sufficient, competent evidence to support a finding of professional negligence on the part of the Defender Association, as she testified that they failed to satisfy the standard of care owed to ZF1 and ZF2 in representing both their legal interests and their best interests. The facts at trial supported the claims that the Defender Association failed to further investigate the allegations of abuse raised at the May 29, 2014 dependency hearing. The record evidence established that all three elements were met and thus the jury's verdict is sustained. Therefore, their claim for judgment notwithstanding the verdict fails.

1925(a) Op. at 16-17.

This was not error. Plaintiffs' evidence was sufficient to establish that the Defender Association breached its duty of care by failing to investigate once it became aware that one of the children had reported, "I sit on the floor with my panties down." Williams initially offered such an opinion without Plaintiffs' counsel making the alleged misrepresentation. Plaintiffs' counsel referred Williams to the portion of the dependency transcript that includes that allegation and asked if that was "something that the child advocate is supposed to follow up on." N.T., 11/19/18, at 18-19. She responded, "Absolutely," and explained that the Defender Association had an affirmative duty to gather information and investigate because of the possibility of abuse. *Id.* at 19-21. She then opined that the Defender Association's failure to do so was a breach of the standard of care. *Id.* at 21-22.

The alleged mischaracterization appeared later, when Plaintiffs' counsel asked Williams a hypothetical question, at which point she offered an opinion incorporating the allegation that the child was "made" to sit on the floor without underwear. *See id.* at 24. However, Williams later read the portion of the dependency transcript containing the report of abuse, and this time did not make the misstatement:

> He said that he felt that the kids were being spanked in the foster home because during one of the visits – and he's here to testify to that -- they asked the children something . . . about their bottom. And one of the kids reported: "I sit on the floor with my panties down, or something, and then they said something else."

*Id.* at 49-50.

Plaintiffs' counsel closed his examination of Williams, again without making the alleged misrepresentation, by asking if a child advocate is "required to follow up on issues surrounding spankings as well as sitting on the floor with one's panties down." *Id.* at 36. Williams again responded that the Defender Association breached a duty of care when it did not follow up on the report. *See id.*

The Defender Association then cross-examined Williams, making the point that the transcript did not include allegations that Z.F.1 was "made" to sit on the floor without underwear, or that such occurred in front of foster father:

> **Q.** Does that paragraph indicate Mr. Keeny's name?
>
> **A.** No.
>
> **Q.** Does it say she's being made to sit on the floor with her panties down?
>
> **A.** No.
>
> **Q.** Does it say: "I was made to sit in front of Mr. Keeny, a foster parent in his sixties, with no underwear on"?
>
> A. No.

*Id.* at 50.

The jury thus heard the expert's direct testimony both with and without the allegedly inaccurate characterization of the transcript, as well as a cross-examination making the very point the Defender Association now urges on us. The jury thus had this the information before it to judge the basis of Williams'

opinion and to determine the credibility and weight to give her testimony. When it did so, it held against the Defender Association. Viewing the evidence in the light most favorable to the Plaintiffs, as verdict-winners, as our standard of review requires, we find the evidence sufficient to prove breach of duty. This issue fails.

## 2. Causation

The Defender Association next claims Plaintiffs failed to establish causation. It maintains that there was no evidence to establish that whatever happened at the May 2014 hearing was a substantial factor in causing harm to Children. It argues that it "is pure speculation to say that additional follow-up by the Defender [Association] after the 2014 hearing would have resulted in the discovery of abuse and/or removal of [C]hildren from the [foster parents'] home." Defender Association's Br. at 49. It claims the only evidence as to causation was expert testimony that inaction following the hearing "left open the possibility that [C]hildren could be exposed to future harm." *Id.* at 50 (emphasis omitted).

Here, the trial court concluded:

> The Defender Association . . . posits that [P]laintiffs failed to provide sufficient evidence to establish that the Defender Association's conduct was a "but for" cause of the harm to ZF1 and ZF2. (Def.'s Memorandum of Law at 14). However, [P]laintiffs presented evidence at trial which showed that an attorney from the Defender Association was present at the May 29, 2014 dependency hearing when [Father] raised allegations of both physical and sexual abuse. N.T. 11/16/18 PM at 106. Testimony presented by Expert Witness Attorney Williams noted that a child advocate who was made aware

of this information should have taken further steps to look into the allegations of abuse. *Id.* at 107. The evidence also showed that the Defender Association failed to further investigate or question the allegations of abuse raised at the May 29, 2014 dependency hearing, which led to [C]hildren remaining in the Keeny home for approximately twelve more months before they were removed on May 13, 2015. N.T. 11/16/18 PM at 61. [Father] testified that, after removal from the Keeny home, ZF1 exhibited symptoms of bed wetting, anger issues, and fecal smearing. N.T. 11/16/18 AM at 16-17. In addition, he testified that ZF1 touched herself in private areas and stared blankly. *Id.* With regards to ZF2, [Father] testified that he exhibited symptoms of bed wetting, pulled his hair out and bit his nails. *Id.* Plaintiffs' expert, Dr. Altman, testified that she believed ZF1 and ZF2 suffered from posttraumatic stress disorder. N.T. 11/15/18 at 63. Thus there was sufficient evidence in this record for the jury to conclude that the Defender Association's professional negligence was <u>a</u> factual cause of harm to [C]hildren and that both ZF1 and ZF2 suffered actual damage as a result of the Defender Association's negligent conduct. The Defender Association is thus not entitled to judgment notwithstanding the verdict in regard to this issue.

1925(a) Op. at 15-16 (emphasis in original).

We agree with the trial court that the jury reasonably could have concluded that the Defender Association's breach of the standard of care caused harm to Children. The trial court did not err when it denied the motion for JNOV.

## C. Motion for New Trial

In its next three issues, the Defender Association argues the court erred in denying its motion for a new trial, which was based on alleged errors in evidentiary rulings regarding expert testimony. "Our standard of review in denying a motion for a new trial is to decide whether the trial court committed

an error of law which controlled the outcome of the case or committed an abuse of discretion." ***Corvin v. Tihansky***, 184 A.3d 986, 992 (Pa.Super. 2018) (citation omitted). "The admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion." ***Woodard v. Chatterjee***, 827 A.2d 433, 440 (Pa.Super. 2003) (quoting ***Walsh v. Kubiak***, 661 A.2d 416, 419 (Pa.Super. 1995) (*en banc*)).

To be admissible, "expert testimony must be based on more than mere personal belief, and must be supported by reference to facts, testimony or empirical data." ***Snizavich v. Rohm and Haas Co.***, 83 A.3d 191, 195 (Pa.Super. 2013) (citations and internal quotation marks omitted). Although an expert may rely on information and data not in evidence, "an expert may not act as a 'mere conduit or transmitter of the content of an extrajudicial source.'" ***Woodard***, 827 A.2d at 444 (quoting ***Primavera v. Celotex Corp.***, 608 A.2d 515, 521 (Pa.Super. 1992)).

> An "expert" should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment. Obviously, in such a situation, the non-testifying expert is not on the witness stand and truly is unavailable for cross-examination. The applicability of the rule permitting experts to express opinions relying on extrajudicial data depends on the circumstances of the particular case and demands the exercise, like the admission of all expert testimony, of the sound discretion of the trial court. Where . . . the expert uses several sources to arrive at his or her opinion, and has noted the reasonable and ordinary reliance on similar sources by experts in the field, and has coupled this reliance with personal

observation, knowledge and experience, we conclude that the expert's testimony should be permitted.

*Id.* at 444-45 (quoting ***Primavera***, 608 A.2d at 521).

Further, "an expert witness may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of matters testified to in discovery proceedings or included in a separate report." ***Woodard***, 827 A.2d at 441 (citation omitted); ***see also*** Pa.R.C.P. 4003.5(c). "No 'hard and fast rule [exists] for determining when a particular expert's testimony exceeds the fair scope of his or her pre trial report,' and we must examine the facts and circumstances of each case." ***Id.*** at 442 (citation omitted). We have stated that, when determining whether testimony is within the fair scope of the report:

> The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

*Id.* (quoting ***Feden v. Consol. Rail Corp.***, 746 A.2d 1158, 1162 (Pa.Super. 2000)) (emphasis removed).

### 1. Refusal to Strike Expert Testimony

The Defender Association claims the court erred in denying its request to grant a new trial based on the court's failure to strike allegedly prejudicial testimony of the Plaintiffs' expert on the standard of care, Attorney Williams. It argues that Williams testified about three purported breaches – failure to retrieve medical records, failure to make efforts to reunify Children with

Father, and failure to follow up on the statements regarding abuse. However, because Plaintiffs withdrew the first two claims, the Defender Association claims the court erred when it denied its motion to strike testimony about the two withdrawn theories.

The trial court found:

> The Defender Association . . . contends that this Court erred by failing to strike Expert Witness Attorney Williams' "irrelevant testimony" regarding reunification and medical records. (Def.'s Memorandum of Law at 20). The Defender Association argues that this testimony carried a danger of unfair prejudice sufficient to inflame the jury. *Id.* The Defender Association waived their right to assert this claim as they failed to timely object to this testimony. Expert Witness Attorney Williams testified regarding reunification and medical records on November 15, 2018. N.T. 11/15/18 at 50, 151-183. Between November 15, 2018 and November 19, 2018, Expert Witness Attorney Williams testified on direct examination, cross-examination by both the Keenys' counsel and the Defender Association's counsel, [P]laintiffs' re-direct, and the Defender Association's re-cross-examination. N.T. 11/15/18; N.T. 11/19/18 PM. It was not until the Defender Association's re-cross-examination of Expert Witness Attorney Williams on November 19, 2018, that the Defender Association moved to strike Expert Witness Attorney Williams' testimony regarding medical records and reunification. N.T. 11/19/18 PM at 90. In response, this Court requested that the parties agree upon language for [P]laintiffs' counsel to use in their closing argument to inform the jury of the limitation on the Defender Association's liability with regards to the reunification and medical records in question. N.T. 11/20/18 at 6-10.
>
> The parties could not agree upon language, thus the Defender Association renewed its objection and this Court overruled it. N.T. 11/21/18 at 30-32.
>
> The Defender Association failed to timely object to Expert Witness Attorney Williams' testimony regarding

> reunification and medical records, thus the Defender Association waived this issue and this claim fails.

1925(a) Op. at 21-22.

We do not think the Defender Association waived this issue by failing to object when Williams gave the testimony that the Defender Association later sought to strike. After all, the objection only arose after Williams gave that testimony. Nor do we think that the Defender Association's questioning of Williams on cross-examination amounted to a waiver, as the questioning was narrowly focused on medical records, and did not mention the separate reunification claim. Nor did the questioning elicit any testimony reiterating an opinion about either of the withdrawn claims.

We nonetheless affirm, albeit on a different basis. Even assuming the trial court ought to have struck the testimony, the Defender Association did not sustain prejudice. Plaintiffs informed the jury themselves during closing argument that their case against the Defender Association was limited to the sole remaining theory, and they did not attempt to obtain a verdict based on a withdrawn claim.

## 2. Preclusion of Expert Opinion Based on Fair Scope Rule

The Defender Association next claims the court erred in excluding testimony from its expert, Attorney Stretton. It claims the court's ruling that the expert could not testify regarding an opinion as to the child sitting on the floor was error because the report indicated the expert reviewed the 2014 transcript, and it was the basis of the opinion that the Defender Association satisfied its duty of care. It claims the preclusion based on the fair scope rule

- 27 -

was error because the opinion was expressly in the report. It claims "[t]he omission of specific words from an otherwise unobjectionable expert report is not a basis for precluding expert testimony." Defender's Br. at 59. It argues it was prejudiced by this preclusion because it was left without evidence to rebut the testimony that it breached the standard of care at the 2014 hearing.

The trial court concluded:

> In Expert Witness Attorney Stretton's expert report, he briefly acknowledged an incident where ZF1 was made to sit on the floor "without her underwear". Pl.'s Exhibit 322 at 5. The text concerning this incident made no reference to the May 29, 2014 dependency hearing. *Id.* Expert Witness Attorney Stretton's report referred to only one instance in or around May of 2015, when [Father] spoke with a Bethanna supervisor regarding his concerns: "He said the female minor was made to sit on the floor without underwear." *Id.* (Emphasis added)[.] Aside from this lone statement, Expert Witness Attorney Stretton did not discuss the incident, nor did he address this incident with regards to his determination of whether or not Defender Association Attorney White breached her standard of care. When asked on direct examination if he was familiar with the incident where ZF1 was "sitting on the floor without her panties", Attorney Stretton confirmed that he was familiar with this incident. N.T. 11/20/18 at 105. The attorney for the Defender Association then asked, "Do you have an opinion, within a reasonable degree of legal and ethical certainty, as to whether Ms. Arthur White's representation in total at that hearing on the 29th met the standard of care?" *Id.* (Emphasis added)[.] Plaintiffs' attorney timely objected, on the grounds that [P]laintiffs "were not on notice that this witness was going to offer testimony that there was compliance within the standard of care with respect to follow-up investigation on the sitting on the floor with her panties down." *Id.* at 106. This Court sustained the objection, *id.*, and precluded Attorney Stretton from testifying to anything having to do with the panties and sitting on the floor. *Id.* at 121-22.

The Court found that this testimony fell outside the fair scope of Attorney Stretton's report. Plaintiffs were unable to discern, from his report, that he would be rendering an opinion concerning Defender Association Attorney White's representation at the May 29, 2014 dependency hearing specific to the concerns raised about ZF1 being made to sit on the floor with or without her panties. In his report, he had only referenced [Father] mentioning this concern in May of 2015 to the Bethanna supervisor, not at a court hearing on May 29, 2014. Pl.'s Exhibit 322 at 5. Allowing Attorney Stretton to testify to his opinion based on a different allegation than what he noted in his report would have constituted unfair surprise. Therefore, this Court properly acted within its discretion when it precluded Attorney Stretton from testifying with regards to the incident of ZF1 being made to sit on the floor with her panties down.

Aside from this incident, Expert Witness Attorney Stretton was permitted to testify with regards to his opinion as to whether Defender Association Attorney White had met her duties and responsibilities to represent [C]hildren. N.T. 11/20/18 at 100. This testimony sufficed for Expert Witness Attorney Stretton's opportunity to counter the opinion offered by [P]laintiffs' expert and thus was part of the evidence for the jury's consideration.

1925(a) Op. at 23-25 (emphasis in original).

We conclude the trial court did not abuse its discretion. The expert report did not provide an opinion as to whether the Defender Association acted within the standard of care following the May 2014 hearing regarding the claim that Z.F.1 sat on the floor without underwear, and the court did not abuse its discretion concluding that providing such an opinion at the trial was beyond the fair scope of the report.

### 3. Preclusion of Expert Testimony Conveying Opinion of Others

The Defender Association also argues that the court erred when it prevented the jury from hearing expert testimony from Dr. Steinberg

rebutting the evidence that Children were suffering from post-traumatic stress disorder. It claims the court erred in finding the expert "bootstrapped her opinion off the opinions of others." Defender's Br. at 60. Dr. Steinberg's expert report noted the expert reviewed the medical records and doctor notes and formed an opinion that "'the treatment providers that saw [Children] for the longest period of time' had correctly concluded [C]hildren showed no lingering effects from PTSD." *Id.* (citation omitted) (alteration in original). It noted an expert may base an opinion on the opinions of others. Further, here the expert conducted an independent evaluation of the work done by the physicians and concluded they were right in their assessment.

The trial court stated:

> The Defender Association contends that Dr. Steinberg only relied on records from others in the field in forming her opinion that ZF1 and ZF2 did not suffer from posttraumatic stress disorder. N.T. 11/20/18 at 308-09. To the contrary, Dr. Steinberg testified regarding another provider's opinion as to whether ZF1 and ZF2 suffered from posttraumatic stress disorder. *Id.* at 303. In reference to ZF1 and ZF2, Dr. Steinberg stated, "at the current time, I do not believe they have posttraumatic stress disorder". *Id.* When asked why she believed that, Dr. Steinberg replied:
>
>> Because the treatment providers that saw them for the longest period of time at Joseph J. Peters Institute in Philadelphia got to know them very well, worked with the father, worked with the last foster parent before transition to the biological family. And over many months of working with [C]hildren, their father and initially the last foster parent did not believe that they met the criteria for that diagnosis.
>
> *Id.*

> Following an objection by [P]laintiff's counsel, this Court struck Dr. Steinberg's testimony regarding the opinions offered by others in the field as to whether [C]hildren suffered from posttraumatic stress disorder. *Id.* at 305. This Court properly precluded Dr. Steinberg's testimony rendering the opinions of others, thus this assignment of error fails and the Defender Association is not entitled to a new trial.

1925(a) Op. at 26.

We conclude the court did not abuse its discretion in precluding Dr. Steinberg from testifying as to what other doctors concluded. *See Woodard*, 827 A.2d at 444.

### D. Remittitur

In its last argument, the Defender Association argues the jury award and apportionment of damages to the Defender Association were excessive and warranted remittitur. It argues there was "no credible basis for the jury's finding that the Defender Association was 55% liable for damages from physical abuse administered by others when [the foster parents] were found only 25% liable." Defender's Br. at 63.

Remittitur is the "procedural [process] by which an excessive verdict of the jury is reduced." *Carlino v. Ethicon, Inc.*, 208 A.3d 92, 118 (Pa.Super. 2019) (alteration in original). "[T]he decision to grant a remittitur depends on whether the award of compensatory damages lies beyond 'the uncertain limits of fair and reasonable compensation' or whether the verdict 'so shocks the conscience as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption.'" *Id.* (quoting *Hammons v. Ethicon, Inc.*, 190 A.3d

1248, 1285-86 (Pa.Super. 2018)). The standard "is highly deferential, because the trial judge serves not as finder of fact but as impartial courtroom authority with obligation to give great respect to the jury's function." *Id.* (citations omitted). "This Court is not free to substitute its judgment for that of the fact finder. Rather, it is our task to determine whether the lower court committed a clear or gross abuse of discretion when conducting its initial evaluation of a defendant's request for remittitur." *Id.* (citations and quotation marks omitted).

The trial court found the award did not shock the conscience:

> The Defender Association alleged that the jury award is excessive and exorbitant. Additionally, the Defender Association argued that the jury apportionment of [55%] liability to the Defender Association was excessive and is evidence of partiality, prejudice, or mistake. The Defender Association failed to put forth any evidence from the trial to establish that the verdict so shocked the sense of justice as to suggest that the jury was influenced by partiality, prejudice, or mistake. The jury award fell within the uncertain limits of fair and reasonable compensation and the award was neither excessive nor exorbitant. The Defender Association failed to put forth evidence to establish that this Court committed an abuse of discretion or an error of law, thus, in denying its request for remittitur, this claim fails.

1925(a) Op. at 27 (citations to record omitted).

We conclude the trial court did not commit a clear or gross abuse of discretion. Neither the amount awarded by the jury, or its apportionment among the defendants, shocks the conscience.

Judgment affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 12/16/2020*