J-A01038-21

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SHARON HOPKINS AND FELICIA HOPKINS, AS CO-ADMINISTRATRIXES FOR THE ESTATE OF PATRICIA H. BROWN, DECEASED, | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : | |
| COMPASS POINTE HEALTHCARE SYSTEM, LLC., REST HAVEN NURSING CENTER (CHESTNUT HILL), INC. D/B/A CHESTNUT HILL LODGE HEALTH AND REHABILITATION CENTER, CHESTNUT HILL HEALTH CARE, LLC., LYRIC HEALTHCARE, LLC., LYRIC HEALTHCARE HOLDINGS III, INC., ENCORE HEALTHCARE, LLC., TFN HEALTHCARE INVESTORS, LLC., TFN HEALTHCARE PARNTERS, LP., OHI ASSETS II (PA) TRUST, OMEGA HEALTHCARE INVESTORS, INC., ADDIT, LLC., SLC PROFESSIONALS CHAI, LLC., SLC PROFESSIONALS MONARCH, LLC., AND DAVID SMILEY, | : : : : : : : : : : : : : : : : : : : | |
| Appellees | : | No. 3554 EDA 2019 |

Appeal from the Judgment Entered December 11, 2019
in the Court of Common Pleas of Montgomery County
Civil Division at No(s): No. 2015-23480

BEFORE:   BENDER, P.J.E., OLSON, J. and STRASSBURGER, J.*

MEMORANDUM BY OLSON, J.:                    **FILED AUGUST 6, 2021**

Appellants, Sharon Hopkins and Felicia Hopkins (collectively,

"Plaintiffs"), co-administratrixes for the estate of Patricia H. Brown

*Retired Senior Judge assigned to the Superior Court.

("Decedent"), appeal from the December 11, 2019 judgment entered in favor of Rest Haven Nursing Center (Chestnut Hill), Inc. d/b/a Chestnut Hill Lodge Health and Rehabilitation Center ("Facility"); Compass Pointe Healthcare System, LLC.; Chestnut Hill Healthcare, LLC.; Lyric Healthcare, LLC.; Lyric Healthcare Holdings III, LLC.; Encore Healthcare, LLC.; TFN Healthcare Investors, LLC.; Addit, LLC.; SLC Professionals Chai, LLC; SLC Professionals Monarch, LLC.; and David Smiley (collectively, "Other Defendants").[1] For the following reasons, we affirm.

We begin with the trial court's summary of this wrongful death and survivors' negligence action.

> [Decedent] was a sixty-four[-]year old, diabetic woman with peripheral vascular disease. In 2013, she was hospitalized for altered mental state, back pain, vomiting and a recent fall at home. During her stay, the hospital addressed various other medical conditions including an infection in her heart, muscle weakness, endocarditis, sepsis, low blood pressure, disseminated intravascular coagulation, pressure sore injuries on the sacrum, right heel, and lower back, and end-stage renal disease … affecting her kidneys. After being stabilized at the hospital, it was recommended that the family consider hospice and comfort care for [] Decedent. The family chose instead rehabilitative treatment and admitted her to the [Facility, which is a] nursing home...on September 10, 2013[,] to continue antibiotics, rehabilitation, and bed rest.
>
> The Facility developed a [c]are [p]lan for Decedent on September 10, 2013, which was updated on September 23, 2013 and November 9, 2013, respectively. Twelve days following admission

---

[1] Plaintiffs also filed suit against TFN Healthcare Partners, LP, OHI Assets II (PA) Trust, and Omega Healthcare Investors, Inc. (collectively, "Nonsuit Defendants"). The Nonsuit Defendants filed a motion for nonsuit at the close of Plaintiffs' case, which the trial court granted. Plaintiffs do not contest this outcome on appeal.

to the Facility [(*i.e.*, September 22, 2013),] nursing home staff found Decedent on the floor after a fall from her bed. No injuries were reported at the time. Decedent had pre-existing issues with her back. On September 27, 2013, five days after the fall event, Decedent complained of back pain and the Facility called a doctor who ordered an x-ray of the whole back. As her back pain and condition worsened, pain medications were prescribed.

During her stay at the Facility, Decedent received dialysis several times a week because of pre-existing issues with her kidneys. Emergency Medical Technician Katrese Johnson transported [Decedent] to her dialysis treatments. While a resident of the Facility, Decedent was frequently incontinent. On November 29, 2013, Decedent was re-admitted to the hospital because of change in mental status and lethargy. Decedent died on November 30, 2013. The cause of her death was sepsis.

On August 24, 2015, Plaintiffs filed a [c]omplaint against [the Facility and Other Defendants] alleged to be affiliated with the … Facility. Rest Haven Nursing Center owned the Facility. Addit-Monarch, LLC had a consulting agreement with the Facility. SLC Professionals Monarch, LLC also had a management agreement with … the Facility. Encore merged or became known as Addit, and both became branded under the brand name Compass Pointe.

From October 15, 2019[,] through October 25, 2019, [the trial court] held a seven day trial concerning whether the Facility was negligent in rendering care to [] Decedent and caused her death. [Plaintiffs'] nursing expert, Carol Sheppard, opined that the Facility fell below the standard of care in conducting an appropriate intake assessment of Decedent, designing her [c]are [p]lan, and treating her pressure injuries to prevent deterioration and infection. [Plaintiffs'] expert in internal medicine, Dr. Ziad Mirza, M.D., opined that [the Facility and Other] Defendants did not respond appropriately to changes in Decedent's conditions, nor provided appropriate nutrition given her conditions. Further, Plaintiffs alleged that Decedent's injuries and death were a direct and proximate cause of [negligence] and/or reckless corporate policies and procedures, lodging claims of corporate negligence against [the Other] Defendants affiliated with the [Facility]. After Appellants closed their case, the [trial c]ourt granted [the Facility, Other Defendants, and Nonsuit Defendants'] motion for nonsuit in part, dismissing [the Nonsuit Defendants entirely] as the trial

record was devoid of evidence connecting [the Nonsuit Defendants] with Decedent's care. The jury issued a verdict finding for the [Facility and Other] Defendants. Specifically, the jury found that the Facility was negligent in rendering care to the Decedent, but that such negligence was not the factual cause of her death. The jury never reached the issue of corporate negligence [of the Other Defendants] because the Facility itself could not be found liable for damages. [Plaintiffs] promptly filed a post-trial motion requesting a new trial, which the Court denied. They [then] timely filed a [n]otice of [a]ppeal and Pa.R.A.P. 1925(b) Statement.

Trial Court Opinion, 6/10/2020, at 1-4. The trial court filed an opinion pursuant to Pa.R.A.P. 1925(a).

On appeal, Plaintiffs raise four issues.

1. Whether the trial court erred in failing to grant a new trial on the basis that it erroneously precluded the jury from determining whether any of the [Other] Defendants were directly liable under a corporate negligence theory?

2. Whether the trial court committed reversible error by failing to instruct the jury on joint-venture liability and failing to include a question regarding joint venture on the verdict sheet?

3. Whether the trial court erred in limiting the testimony of Plaintiffs' expert?

4. Whether the trial court erred in permitting [the Facility and Other] Defendants' expert to testify inconsistent with and beyond the fair scope of his written report?

Plaintiffs' Brief at 3.

In each issue, Plaintiffs argue that the trial court should have granted a new trial. As such, we bear the following standard in mind in our review.

In reviewing a trial court's denial of a post-trial motion seeking a new trial, this Court applies a deferential standard of review. The decision whether to grant or deny a new trial is one that lies within the discretion of the trial court. We will not overturn such a

decision unless the trial court grossly abused its discretion or committed an error of law that controlled the outcome of the case.

***Woullard v. Sanner Concrete and Supply***, 241 A.3d 1200, 1211 (Pa. Super. 2020) (citation omitted).

## Corporate Negligence

In their first issue, Plaintiffs argue the trial court erred by denying their motion for a new trial because the jury was wrongly precluded from determining whether the Other Defendants were directly liable under a corporate negligence theory. Plaintiffs contend that they proved the Facility and Other Defendants merged together under the brand Compass Pointe and "exercised complete control over the Facility, including staffing, purchasing supplies, and even the type of residents that were admitted to the Facility." Plaintiffs' Brief at 50. According to Plaintiffs, there was a corporate-imposed action plan to increase census with high-needs residents but without the corresponding necessary staff and supplies to serve such residents. ***Id.*** at 51. In Plaintiffs' view, the Other Defendants' actions were negligent and caused Decedent's harm. ***Id.*** Plaintiffs contend that the verdict sheet deprived the jury of the opportunity to consider separately and independently whether the Other Defendants were negligent and the cause of Decedent's

harm.[2,3] *Id.* at 52. Notwithstanding the jury's determination that the Facility was not the cause of Decedent's harm, Plaintiffs assert that the trial court should have granted their motion for a new trial to permit the jury to consider the liability of the Other Defendants because Plaintiffs' direct corporate negligence claim against the Other Defendants was separate from their negligence claim against the Facility. *Id.* at 50-53.

The trial court offers the following analysis of Plaintiffs' first issue. It asserts that, instead of providing direct proof of the relationships between the Facility and the Other Defendants at trial, Plaintiffs "attempted to chain-link direct liability claims through various ownership entities without establishing

---

[2] Over the objection of the Plaintiffs, the verdict sheet instructed the jurors to answer a series of questions. If they answered affirmatively, they were to proceed to the next question. If they answered negatively, the verdict sheet informed jurors that Plaintiffs could not recover and to cease answering questions. Question one asked jurors whether they found the Facility to be negligent. Question two asked jurors to determine whether the Facility's negligence was a factual cause of the harm to Decedent. Question three listed Other Defendants' names separately and asked the jurors to determine whether each entity was directly liable to Plaintiffs under a theory of corporate negligence. Question four again listed Other Defendants' names separately and asked the jurors to determine if any of the Other Defendants' negligence was a factual cause of Decedent's harm. The remaining questions related to damages. The jurors answered yes to question one, indicating that the Facility was negligent, but no to question two, indicating that the Facility was not the cause of Decedent's harm. Accordingly, consistent with the trial court's directions, the jurors did not answer the questions asking whether the Other Defendants were negligent and/or the cause of Decedent's harm.

[3] David Smiley, the Facility's administrator, was the only individual person Plaintiffs sued. The verdict sheet did not list Mr. Smiley's name. The judgment in the certified record also does not list Mr. Smiley's name, but the printed text listing the defendant entities appears to be cut off and the docket sheet includes Mr. Smiley in its recorded judgment.

their individual responsibility for acts at the Facility or a connection to any agents' actions at the Facility to establish a relationship or a duty of care owed between the Decedent and the affiliated entities [of the Facility]." Trial Court Opinion, 6/10/2020, at 8. In the trial court's view, Plaintiffs merely established broad evidence that the Facility and Other Defendants merged and became branded under the trade name Compass Pointe, but failed to prove the Other Defendants owed a direct duty to Decedent in accordance with our Supreme Court's decision in *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012) ("*Scampone II*"). Trial Court Opinion, 6/10/2020, at 9. In other words, an entity who owns or manages a nursing home facility cannot be liable simply because of its ownership or management. *See id.* ("Direct liability cannot extend indefinitely from the patient to [any entity] affiliated with the Facility.").

If Plaintiffs established anything, the trial court maintains, it was that a duty existed between Encore Healthcare LLC and residents of the Facility because Encore Healthcare, LLC "undertook a contractual duty to oversee employees and ensure compliance with laws and regulations." *Id.* at 10. But even if Encore Healthcare, LLC or the rest of the Other Defendants owed a duty to supervise and oversee operations at the Facility, Plaintiffs needed to show that the Other Defendants' negligent supervision and oversight of the Facility caused Decedent's harm. *Id.* at 12. Because the jury found that the Facility itself did not cause Decedent's harm, the trial court reasons that the

Other Defendants' supervision and oversight of the Facility could not have caused Decedent's harm. ***Id.***

We begin with a review of the ***Scampone*** decisions, which address corporate negligence liability in the nursing home context. Scampone, who resided in a nursing home, died of a heart attack at age 94. Scampone's estate executor filed a survivors' action and wrongful death action on behalf of the estate against the licensed owner and operator of the nursing home, a corporation that managed the nursing home, and three other entities with direct or indirect ownership interests in the nursing home. The trial court dismissed all defendants except the owner/operator following a motion for nonsuit at the close of the estate's case. The jury then found the owner/operator directly and vicariously liable for negligence. On appeal, this Court affirmed in part, holding the trial court properly permitted the claim against the owner/operator to proceed to the jury. We also reversed in part, holding that the trial court improperly granted the motion for nonsuit because, *inter alia*, the estate had offered sufficient evidence with respect to corporate negligence against the management company. ***Scampone v. Highland Park Care Ctr., LLC***, 11 A.3d 967 (Pa. Super. 2010) ("***Scampone I***").

Our Supreme Court granted the petitions for allowance of appeal filed by the owner/operator and management company. In explaining negligence generally, the Court observed that a plaintiff may proceed on theories of direct and vicarious liability concomitantly or alternately. ***Scampone II***, 57 A.3d at

597. Under a direct liability theory, a plaintiff seeks to hold a defendant responsible for harm the defendant caused by breach of a duty owed directly to the plaintiff. *Id.* Vicarious liability, on the other hand, is imputed negligence. In other words, based upon a relationship between parties A and B, the plaintiff seeks to hold party B responsible for the negligence of party A, even though party B played no role in party A's conduct. *Id.*

Generally, because a corporation assumes the risk of its agents' negligence under vicarious liability, the "corporation's liability [is] derivative of the agents' breach of their duties of care to the plaintiff." *Id.* at 598. This implies that if the claim against the agent is extinguished, the claim against the corporation is as well. *Id.* Our Supreme Court, however, determined this is not so in a claim of direct corporate negligence. "[A] corporation may also owe duties of care directly to a plaintiff, separate from those of its individual agents, such as duties to maintain safe facilities, and to hire and oversee competent staff." *Id.*, citing *Thompson v. Nason Hosp.*, 591 A.2d 703 (Pa. 1991). In other words, within the context of a claim asserting direct corporate negligence, a corporation itself, separate and apart from the success of any claim against a corporation's agent, can be liable directly to a plaintiff when a corporation acts or fails to act when it has a duty to do so. *Scampone II*, 57 A.3d at 598. Thus, in the context of a nursing home, the Court held that "a nursing home and affiliated entities are subject to potential direct liability for negligence, where the requisite resident-entity relationship exists to establish

that the entity owes the resident a duty of care[.]" *Id.* at 584. Because the trial court in *Scampone* failed to consider whether the owner/operator and/or management company owed a duty directly to Scampone, our Supreme Court remanded the case for the trial court to make such a determination. *Id.* at 606-07. It instructed the trial court to conduct an individualized inquiry as to each entity to ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." *Id.*

On remand, the trial court determined that the owner/operator had a non-delegable duty to render proper care to Scampone due to its direct contractual relationship with her, its direct care to residents, and its status as the licensed owner of the nursing home. *Scampone v. Grane Healthcare Co.*, 169 A.3d 600, 620 (Pa. Super. 2017) ("*Scampone III*"). The trial court found that the management company did not owe a duty to Scampone and, therefore, was not liable to her under a theory of direct corporate negligence. After the trial court again granted a nonsuit in favor of the management company, the estate appealed to this Court.

On appeal, this Court reversed the grant of nonsuit to the management company, holding that the estate proved that the management company had a duty to render services to Scampone pursuant to Restatement (Second) of

J-A01038-21

Torts §§ 323 and 324(A). ***Scampone III***, 169 A.3d at 617-19.[4]  This Court

observed that the management company was the parent company of the

owner/operator.  ***Id.*** at 618 n.6.  Pursuant to a management agreement

---

[4] Section 323 deals with "the liability of the actor to the one to whom he has undertaken to render services."  Restatement (Second) of Torts § 324A (Comment).  Section 323 provides as follows.

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323.

Section 324A is similar to section 323 but "deals with the liability to third persons" instead.  Restatement (Second) of Torts § 324A (Comment).

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A.

- 11 -

between the management company and the owner/operator, the management company was required to develop a quality assurance program to assure that the owner/operator provided quality nursing services to the nursing home residents and managed all aspects of the nursing home's operation. *Scampone III*, 169 A.3d at 618. The owner/operator set staffing levels, but the management company had to approve the budget for the staff. *Id.* The management company hired and trained all registered nurses, sent a nurse consultant weekly to oversee patient care, created the policies and procedures for the nursing home, set the budget, and supervised the nursing home's administrator. *Id.*

Because the management company contractually undertook to render services to the nursing home's residents by managing their care and overseeing the nursing home's operations, it should have recognized that the services were necessary for the protection of the residents, all of whom were elderly and infirm. *Id.* at 619. Thus, this Court concluded that the management company had a direct duty of care towards Scampone and was subject to liability for physical harm resulting from its failure to exercise reasonable care in its performance of that duty. *Id.* It mattered not that the management company's contract was with the owner/operator and not Scampone directly. *Id.*

Having decided that the management company owed a direct duty to Scampone, the Court then turned to the issue of whether Scampone could

recover under a corporate negligence claim from both the management company and the owner/operator. *Id.* at 621. This Court held that she could not. *Id.* We observed that our Supreme Court found that the owner or manager of the nursing home is subject to direct corporate liability and has a non-delegable duty to formulate, adopt, and enforce adequate rules and policies to ensure quality patient care. *Id.* The owner/operator "contractually assigned responsibility for that duty" to the management company. *Id.* While the owner/operator is free to assign its performance of a non-delegable duty to a management company, such action will not eliminate its legal responsibility for the management company's negligent performance. Therefore, only the owner/operator could be liable for corporate negligence. *Id.* In sum, the estate could recover from the owner/operator for corporate negligence, and from the owner/operator and management company for the negligence of each entities' employees[5] who were jointly involved in Scampone's care.

---

[5] While Scampone could not recover against the management company under a corporate negligence claim, this Court determined that she could still recover from the management company under a vicarious liability claim. *Id.* at 621-22. The management company voluntarily assumed a duty towards Scampone *vis a vis* its contract with the nursing home. *Id.* at 622. Scampone asserted that the management company was vicariously liable for its own employees' acts and omissions in performing its contractual duties. *Id.* This Court observed that our Supreme Court recognized that "vicarious liability and direct corporate liability were distinct theories of recovery." *Id.* Because nurse consultants employed by the management company "failed to supervise the nursing home's staff properly," and "knew, and did nothing about the fact, that [the nursing home's] staff did not provide nursing home residents proper
*(Footnote Continued Next Page)*

As was the case in *Scampone*, Plaintiffs allege that subpar care of Decedent in the Facility contributed to her death. Specifically, they assail the lack of sufficient staff and supplies, and blame the various corporate entities associated with the Facility for creating a system with "widespread and systemic deficiencies in patient care." Plaintiffs' Brief at 50-52. Plaintiffs contend that the Other Defendants "exercised complete control over the Facility." *Id.* at 50. While Plaintiffs assign blame to Other Defendants for breaching their duty to Decedent, they fail to explain what duty the Other Defendants owed to Decedent in the first place. More precisely, Plaintiffs have neither alleged nor explained how the negligence of an employee of the Other Defendants caused any harm to Decedent. This Court has recognized that the "owner or manager of the nursing home is subject to direct corporate liability and has a non-delegable duty to formulate, adopt, and enforce adequate rules and policies to ensure quality patient care." *Scampone III*, 169 A.3d at 621. When pared down to their essence, Plaintiffs' arguments stem from allegations that the Facility provided Decedent with subpar care and Other Defendants failed to ensure that the Facility provided her with adequate care. Both

---

fluid, testing, nourishment, and medication," and the estate linked these deficiencies to Scampone's death through an expert witness's testimony regarding causation, the jury could find that insufficient staffing levels were a contributing factor in the inability of nursing home employees to provide proper care to nursing home residents. *Id.* at 623. Thus, while it was not liable for corporate negligence, the management company remained potentially vicariously liable for its own employees' actions and inactions. *Id.*

***Scampone II*** and ***Scampone III*** make clear that only one entity can be liable in corporate negligence for a non-delegable duty to a nursing home patient. ***Scampone II***, 57 A.3d at 606-07; ***Scampone III***, 169 A.3d at 621. That is to say, even if the Facility in fact delegated its responsibilities to Decedent to the Other Defendants, it cannot delegate its legal responsibility to ensure quality patient care to the Other Defendants. In simply referring to the Other Defendants' control over the Facility, Plaintiffs fail to articulate what duty the Other Defendants owed directly to Decedent that did not overlap from a corporate negligence standpoint with the Facility's non-delegable duty.

Furthermore, we agree with the trial court that Plaintiffs confuse the relationship between direct liability and vicarious liability claims. Trial Court Opinion, 6/10/2020, at 6. Plaintiffs' reliance on ***Shiflett v. Lehigh Valley Health Network, Inc.***, 174 A.3d 1066 (Pa. Super. 2017), *rev'd on other grounds*, 217 A.3d 225 (Pa. 2019), illustrates their misunderstanding.

***Shiflett*** involved a corporate negligence claim against a hospital based upon its failure to train its nurses regarding fall prevention and a vicarious liability negligence claim against the hospital based upon the actions of its agent, a nurse, who allegedly did not prevent a patient from falling. ***Shiflett***, 174 A.3d at 1089-91. The jury determined the hospital was negligent but the nurse was not. The hospital filed a motion for judgment notwithstanding the verdict, claiming the jury's verdict was inconsistent. It argued the hospital

could not be liable if the nurse was not negligent. The trial court denied the motion.

On appeal, this Court affirmed. We rejected the notion that the verdict was inconsistent, explaining the verdict regarding the nurse reflected an assessment of her personal conduct in failing to prevent the patient's fall and the verdict regarding corporate negligence addressed the hospital's conduct in formulating fall prevention policies and procedures. *Id.* at 1090. We explained that for corporate negligence purposes, "'an injured party does not have to rely on and establish the negligence of a third party,' including a corporate employee." *Id.* (citing *Thompson*, 591 A.2d at 707). This is because "[t]he doctrine of corporate negligence imposes a non-delegable duty on the hospital to uphold a proper standard of care to patients" separate from the liability of practitioners who render medical care to a patient. *Id.*

Thus, the verdicts in *Shiflett* were consistent because one claim was against the hospital for its direct, non-delegable duty to the patient to ensure proper patient care and the other claim was against the hospital vicariously for **its agent's** alleged breach of care to the patient. In the instant case, Plaintiffs set forth no evidence that the Other Defendants acted as agents of the Facility. Instead, Plaintiffs have brought direct corporate negligence claims against multiple entities that are all based upon the Facility's non-delegable duty to Decedent. Because Plaintiffs failed to establish separate duties the Other Defendants owed to Decedent, the trial court neither grossly

- 16 -

abused its discretion nor erred by determining that if the Facility's negligence were not the cause of Decedent's harm, Plaintiffs did not have a basis for obtaining a new trial on a corporate negligence claim against the Other Defendants.[6] ***See Woullard***, 241 A.3d at 1211.

### Joint Venture

In Plaintiffs' second issue, they argue that the trial court erred in denying their request to instruct the injury on the issue of joint liability and to include a question regarding joint liability on its verdict sheet. Plaintiffs' Brief at 53-60. Plaintiffs claim they are entitled to a new trial because evidence at trial revealed that a collection of entities agreed to operate the Facility in a common enterprise for mutual profit and the jury should have been permitted to decide whether the arrangement constituted a joint venture. ***Id.*** Plaintiffs argue that the Facility and Other Defendants "cannot avoid joint-venture liability by simply stating in a contract that their agreement is not to be construed as a partnership or joint venture." ***Id.*** at 59.

> In reviewing Plaintiffs' second issue, we bear the following in mind.

> A trial court should charge the jury only as to legal principles for which there is some factual foundation in the record. In examining jury instructions, our scope of review is limited to determining whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse

---

[6] Unlike the claimants in ***Scampone III***, Plaintiffs here forwarded only claims of corporate negligence against the Other Defendants and did not argue that the Other Defendants were vicariously liable for the negligence of their own employees. ***Cf. Scampone III***, 169 A.3d at 623.

rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled .... In reviewing a trial court's charge to the jury we must look to the charge in its entirety. Because this is a question of law, this Court's review is plenary. It is not the function of the trial court in charging a jury to advocate, but rather to explain the principles of law which are fairly raised under the facts of a particular case so as to enable the jury to comprehend the questions it must decide.

**Graham v. Check,** 243 A.3d 153, 161 (Pa. 2020) (footnotes, quotation marks, and citations omitted).

The trial court offered the following analysis of Plaintiffs' second issue.

"What **constitutes** a joint venture is a question of law; but whether a joint venture **exists** is generally a question of fact." **Keeler v. Int'l Harvester Used Truck Ctr.**, 463 A.2d 1176, 1178 (Pa. Super. 1983) (citing Am.Jur.2d Joint Ventures § 7) [(emphasis in original)].

To constitute a joint venture, certain factors are essential:

1) Each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money;

2) Profits must be shared among the parties;

3) There must be a joint proprietary interest and a right of mutual control over the subject matter of the enterprise;

4) Usually, there is a single business transaction rather than a general and continuous transaction.

**Keeler**, 463 A.2d at 1178 (citing **McRoberts v. Phelps**, 138 A.2d 439 (Pa. 1958)).

In Pennsylvania, the law is clear that in order for a joint venture to come into existence, there must be a showing of a joint proprietary interest and a right of mutual control of the subject matter of the enterprise.

> Without evidence of a shared proprietary interest and right of control, there can be no joint venture. If proprietary control is vested in only one of two parties, the other may be an agent or an employee of the former, but there is no joint venture.
>
> ***Wilkins v. Heebner***, 480 A.2d 1141, 1144-45 (Pa. Super. 1984) (internal citations omitted).
>
> At trial in this case, Plaintiffs sufficiently proved that the corporate [entities] had undertaken certain contractual duties among each other. Carol Pritchett was hired as the Vice President of Encore Healthcare in June 2011 through January 2014 and eventually undertook the same role [] but with the management company of Addit LLC. She testified that Lyric Healthcare, Encore Healthcare, and Addit LLC ultimately became branded under Compass Pointe. This established a right of mutual control or joint proprietary interest. There was also sufficient evidence of profit sharing among the corporate entities that the jury could have inferred that the parties intended a joint venture with respect to provision of healthcare services at the Chestnut Hill nursing home. However, there could be no joint venture as a matter of law because proprietary control was vested only in Compass Pointe. ***See Wilkins, supra.*** Further, there was a clause in the Consulting Agreement and Management Agreement that said that the corporations cannot be held jointly and severally liable; it explicitly stated "No Partnership or Joint Venture." Accordingly, the [trial court] did not instruct the jury on joint venture as such a finding would not be consistent with the law and facts of this case. Defendants were not engaged in a joint venture, but rather a profit-sharing arrangement wherein the majority of control was vested in one party who maintained supervisory control over the others. Therefore, the trial court did not err in refusing to send the issue of whether there was a joint venture among the Defendants to the jury.

Trial Court Opinion, 6/10/2020, at 25-26 (record citations omitted and party designations altered).

Upon review of the record, the parties' briefs, and the applicable caselaw, we discern no clear abuse of discretion or error of law controlling the

- 19 -

outcome of the case. *See Graham*, 243 A.3d at 161. Again, charges to the jury must be based only on legal principles with a sufficient factual foundation in the record. *Id.* Contrary to Plaintiffs' argument, the "existence or non-existence of a joint-venture depends upon what the parties intended," so the parties' explicit disclaimer in a contract does have bearing on whether a joint venture exists as a matter of law. *Keeler*, 463 A.2d at 1178. Additionally, even if the Facility and Other Defendants operated as a joint venture, as explained *supra* the Plaintiffs established only that the Facility owed a duty to Decedent. Because the jury determined that the Facility did not cause the harm to Decedent, any determination that the Facility was managed and operated as a joint venture would not have changed the outcome of the trial. No relief is due on Plaintiffs' second issue.

## Expert Testimony

Plaintiffs' third and fourth issues both address the admission of expert testimony. In their third issue, Plaintiffs claim they are entitled to a new trial because the trial court erred in restricting the testimony of Plaintiffs' expert, Dr. Ziad Mirza. Plaintiffs' Brief at 62-65. Plaintiffs contend the trial court's rulings were prejudicial, impacted the verdict, and warrant a new trial, especially when compared to analogous rulings regarding a defense expert. *Id.* at 65. In their fourth and final issue, Plaintiffs argue the trial court erred by permitting defense expert testimony outside the fair scope of the expert's report. *Id.* at 66-70.

"The admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion." *Z.F.1 by and through Parent v. Bethanna*, 244 A.3d 482, 498 (Pa. Super. 2020) (citations omitted). As a rule,

> [e]xperts may testify at trial concerning matters which are within the fair scope of a pretrial report. The avoidance of unfair surprise to an adversary concerning the facts and substance of an expert's proposed testimony is the primary purpose of the rule requiring that testimony be within the fair scope of the pretrial report. *Walsh v. Kubiak*, 661 A.2d 416, 419-20 (Pa. Super. 1995) (*en banc*).
>
> The fair scope rule is addressed in Pa.R.C.P. 4003.5(c) and provides that an expert witness may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of matters testified to in discovery proceedings or, as here, included in a separate report. In *Wilkes–Barre Iron & Wire Works, Inc. v. Pargas of Wilkes-Barre, Inc.*, 502 A.2d 210 (Pa. Super 1985), this Court explained that:
>
>> [I]t is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular facts and circumstances of each case. The controlling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary's request, "the substance of the facts and opinions to which the expert is expected to testify" is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. In other words, in deciding whether an expert's trial testimony is within the fair scope of [her] report, the accent is on the word "fair." The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and [her] trial testimony is of a nature which would prevent the adversary from preparing a

> meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

*Nazarak v. Waite*, 216 A.3d 1093, 1106–07 (Pa. Super. 2019) (some citations omitted or cleaned up).

Plaintiffs argue the trial court should have permitted their expert Dr. Mirza to testify that the Other Defendants controlled and monitored the Facility's operations and provision of care, which was an opinion he formed based upon his review of various corporate records provided in discovery. *Id.* at 63. Specifically, Plaintiffs point to a question they asked during trial regarding whether Mr. Smiley, the Facility's administrator, had indicated in his deposition that the Other Defendants were responsible for ensuring the Facility followed federal regulations. *Id.* at 64.

The trial court explained its reasoning in limiting Dr. Mirza's testimony as follows. Dr. Mirza testified he was a chief medical officer of a company specializing in wound care and hyperbaric oxygen therapy and had twenty-four years of experience as a medical director for various nursing homes. Plaintiffs offered Dr. Mirza as an expert "qualified in the areas of internal medicine, wound care, and long[-]term care, from the perspective of a medical director." Trial Court Opinion, 6/10/2020, at 18. The trial court noted that Plaintiffs did not present him as an expert in corporate structures, including the involvement of management companies in nursing home operations. *Id.* Moreover, when asked if he had expertise in the corporate structure of nursing

homes, how they are run, and their administrative and financial aspects, Dr. Mirza responded "No, I'm not an expert in that." ***Id.***, *citing* N.T., 10/18/2019, at 36-37. Although in his pre-trial report Dr. Mirza offered an opinion regarding the corporate structure and control of the Facility by the Other Defendants, his pre-trial report "did not justify his testimony on that subject to the jury where he admitted under oath that he was not an expert in those areas." ***Id.*** Accordingly, the trial court sustained a defense objection when Plaintiffs attempted to solicit answers from Dr. Mirza about the corporate structure of the corporate entities, ruling that it was outside Dr. Mirza's scope of expertise. Upon review, given Dr. Mirza's concession that he is not an expert in corporate structures, we conclude the trial court's ruling does not constitute a "manifest abuse of discretion." ***Z.F.1***, 244 A.3d at 498.

Plaintiffs further argue that the trial court should have permitted Dr. Mirza to testify regarding his opinion whether Decedent was a candidate for cardiac surgery to remove a pacemaker. Plaintiffs' Brief at 65. The trial court did not permit Dr. Mirza's testimony on this point because the trial court did not find any mention of the proposed surgery in Dr. Mirza's expert report. Plaintiffs disagree, claiming that the proposed testimony was within the overall fair scope of Dr. Mirza's report. Plaintiffs claim his opinion regarding surgery related to his opinion expressed at trial that the Facility and Other Defendants increased Decedent's risk of harm by not following a hospital plan, of which surgery was a potential component. ***Id.*** In their brief, Plaintiffs do not point

us towards any place in Dr. Mirza's report that provides the basis for his trial testimony. Accordingly, we are not persuaded that the trial court's ruling constituted a manifest abuse of discretion, let alone one warranting a new trial. No relief is due.

Finally, Plaintiffs put forth conclusory and underdeveloped arguments regarding the testimony of defense expert, Dr. Bruce Silver, who was admitted as an expert in internal medicine, geriatrics, care of nursing home patients, and nursing home management. Plaintiffs' Brief at 66-70.[7, 8] Plaintiffs argue that the trial court improperly permitted Dr. Silver to testify outside the scope of his report that based on prior use of prescribed narcotics, Decedent must have suffered back pain prior to her admission to the Facility.

In defending its decision, the trial court noted that "Dr. Silver opined in his report that [Decedent] had severe pain because of an infection in her back caused by bacteria which spread from a bioprosthetic tricuspid valve to the spine" and that her back pain was not caused by the Facility's negligence. Trial Court Opinion, 6/10/2020, at 23. The trial court also explained that Dr. Silver merely summarized evidence regarding Decedent's back pain and prior

---

[7] For example, Plaintiffs argue that Dr. Silver improperly opined that Facility and Other Defendants were "advocating" for Decedent, but Plaintiffs fail to explain what they mean by this argument. *See* Plaintiffs' Brief at 67.

[8] Plaintiffs also assail the qualification of Dr. Silver as an expert in the field of nursing-home operations because he did not review certain background documents. *Id.* This argument goes to the weight the jury should have afforded his testimony, not the admissibility of his testimony or his qualifications to testify as an expert.

procedures that was in her medical records reviewed by and relied upon by Dr. Mirza and Dr. Silver. *Id.* The trial court concluded the reference to her narcotic use was probative of her severe back pain due to infection and was not prejudicial. *Id.* Once again, Plaintiffs have not convinced this Court that the trial court's ruling constitutes a "manifest abuse of discretion" or that a new trial is warranted. *Z.F.1*, 244 A.3d at 498. Accordingly, no relief is due on Plaintiffs' fourth issue.

Because no relief is due on any of Plaintiffs' four issues, we affirm the judgment of the trial court.

Judgment affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/6/2021