J-A17002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| N.W.M. AND E.M., MINORS, THROUGH THEIR PARENTS AND NATURAL GUARDIANS, J.M., N.M., AND J.A.M. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 1532 EDA 2020 |
| PATRICE LANGENBACH AND DEFENDER ASSOCIATION OF PHILADELPHIA | : : : : | |

Appeal from the Order Entered July 8, 2020
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 200300399

BEFORE:   McLAUGHLIN, J., KING, J., and PELLEGRINI, J.*

MEMORANDUM BY McLAUGHLIN, J.:          **FILED FEBRUARY 1, 2022**

N.W.M. ("Child") and E.M. (collectively "Children"), through their parents J.M. and N.M. ("Parents"), and J.A.M. ("Grandmother") (collectively "Appellants"), appeal the order dismissing their Complaint against Patrice Langenbach and the Defender Association of Philadelphia ("Defender Association") (collectively "Appellees"). The trial court found that Appellees were immune from this suit. It also found that, if they did not have immunity, Child stated a claim for legal malpractice against Appellees, but E.M. did not. The court also concluded that neither Children nor Grandmother stated a claim for intentional infliction of emotional distress ("IIED"). We conclude Appellees

_____

* Retired Senior Judge assigned to the Superior Court.

do not have immunity but agree with the trial court that E.M.'s malpractice claim and Children's and Grandmother's IIED claims fail.

In March 2020, Children and Grandmother filed a Complaint against Appellees. The following is a summary of the factual assertions contained in the Complaint.

Child was born in February 2016. In April 2016, Parents took her to the Children's Hospital of Philadelphia ("CHOP"), where a chest x-ray revealed two rib fractures. A CHOP physician concluded the fractures were caused by a non-accidental trauma inflicted by an adult.[1] The Philadelphia Department of Human Services ("DHS") filed an emergency petition to remove Child and her brother, E.M., from Parents' care.

The court appointed Langenbach of the Defender Association as child advocate and the guardian *ad litem* ("GAL"). Children were adjudicated dependent. Child was placed in foster care and E.M. was placed with Grandmother.

Following a July 2016 hearing, the court ordered that Child remain in foster care and reunited E.M. with Parents. Langenbach objected to the reunification of E.M. with Parents. The court declined to place Child in kinship care with Grandmother. Langenbach expressed her agreement with this decision.

---

[1] Parents deny they caused the fracture and claim they do not know how Child got the fractures, noting it could be due to a genetic disorder or could have been caused by E.M.

Following an August 2016 hearing, the court ordered that Child remain in foster care. Langenbach supported the decision. E.M. was discharged from dependent care in August 2016 and has been in his Parents' custody since that time. Langenbach allegedly objected to this discharge. Appellants assert that at the August 2016 hearing, Langenbach moved to remove a social worker from the case because the social worker presented positive reports on Parents. Complaint at ¶ 37, 39. Appellants further allege that Langenbach disparaged Parents at the parenting school they attended.

The court held a hearing in December 2016, where Langenbach allegedly argued against kinship care. Appellants allege that she claimed Grandmother had not been a resource because she did not acknowledge injuries, even though this allegedly had not been mentioned at prior hearings. She also allegedly claimed Child was thriving in foster care and stated that she had concerns about "access" if Child was placed with Grandmother. *Id.* at 58-60. The court entered an order directing that Child would remain in foster care. Parents filed a notice of appeal of this order.

While the appeal was pending, the proceedings continued in the trial court. Appellants claim that at a March 2017 hearing, Langenbach objected to medical evidence Parents sought to admit to explain the rib fractures. *Id.* at ¶ 75. Following the hearing, the court again denied kinship care.

In May 2017, DHS moved to change Child's goal to adoption and to terminate parental rights. Appellants assert Langenbach "was in full agreement with the termination of parental rights." *Id.* at ¶ 90. Following a

hearing, the court granted the motion to change Child's goal. The court removed Langenbach as Child's advocate, but left her in place as GAL. The court again declined to place Child in kinship care or to give Grandmother visitation rights. Appellants allege that at the hearing, a social worker testified that Grandmother's home was appropriate for care, Grandmother had her clearances, and DHS would be exploring kinship care. Appellants assert that when the court asked if there was an order to explore kinship care, Langenbach responded that there was not, and that the court had "indicated that we were not going to be exploring it," even though, according to Appellants' Complaint, the record contained no such instruction. **Id.** at ¶ 101.

Parents filed emergency petitions with this Court to stay consideration of the termination petition until after resolution of the appeal of the December 2016 order. In the trial court, Parents also filed a motion for recusal. Langenbach allegedly filed a response to the motion for recusal, stating, "Nothing in the record indicates a bias, impartiality, or prejudice toward the parents or any party for that matter." **Id.** at 112. The trial judge denied the motion for recusal, and we denied the motion to stay.

At a termination hearing in October 2017, according to the Complaint, a forensic psychologist testified that, based on his parenting capacity report, it was his opinion Parents could reunify with Child. Appellants also claim that an employee of the foster parent agency testified that Child had a bond with Parents. Appellants claim Langenbach objected or joined objections 37 times during the hearing when Parents attempted to admit evidence. Appellants

- 4 -

assert Langenbach argued for the termination of parental rights.[2] The trial court granted termination and changed the goal to adoption.

Parents appealed, and this Court stayed the orders changing the goal to adoption and terminating parental rights. We also reinstated parental visitation. In May 2018, this Court reversed the permanency orders and vacated the orders changing the goal and terminating parental rights. **See In Int. of N.M.**, 186 A.3d 998, 1014 (Pa.Super. 2018). Among other reasons, we stated that "the trial court's repeated refusal to consider approved kinship care, in light of the fact that it also found Parents fully complaint with their treatment goals as of December 2017 and where DHS supported kinship placement with paternal grandmother, is an abuse of discretion and not supported by the record." **Id.** at 1012-13 (citation omitted). We further stated that the trial judge should "give serious consideration as to whether her apparent bias warrants that she recuse herself." **Id.** at 1014 n.31 (citation omitted).[3]

_____

[2] DHS also advocated for the termination of parental rights. Further, the new court-appointed child advocate advocated for termination, although he allegedly admitted he had received the case the day before the hearing.

[3] We noted that the trial judge was the cause of the deterioration of the parental bond:

> [D]espite record evidence that the trial court allegedly relied upon, the one factor, the elephant in the room, is that the trial judge was and remains the cause of the deteriorated bond between Parents and N.M. in this matter.

*(Footnote Continued Next Page)*

> The record is replete with attempts by Parents to meet the goals set by the trial judge, however she continued to put up barriers to reunification. As an example, the trial judge stated at the December 8, 2016 hearing that she wanted some testimony as to how the injuries happened. However, at every hearing from March 2017 onward, she refused to allow such testimony, stating that the failure of Parents to appeal her earlier decision with regard to the etiology of N.M.'s injuries was final and could no longer be addressed. When the agency stated that Parents had complied with their goals, the court said, "I'll find that [P]arents are compliant. It doesn't move the needle for me." She further stated that "I guess the other side of the conversation is if I leave her [in foster care] maybe I get closer to an answer as to what happened instead of moving her to grandmom. . . . So, I'm not going to consider kinship care." When the agency determined that kinship placement was available and appropriate, the trial court ruled in May of 2017 that grandparent visitation with N.M. is immediately suspended; it is not in N.M.'s continued best interests to explore placement in kinship care. In short, despite the goals of the Child Protective Services Law, the trial judge seems to have done everything in her power to alienate these parents from their child, appears to have a fixed idea about this matter and, further, she prohibited evidence to be introduced that might have forced her to change her opinion.
>
> . . . We find that the record herein provides example after example of overreaching, failing to be fair and impartial, evidence of a fixed presumptive idea of what took place, and a failure to provide due process to the two parents involved. Finally, the most egregious failure in this matter is the refusal to allow kinship care, despite the paternal grandmother being an available and approved source for same. The punishment effectuated by the trial judge was, at best, neglectful and, at worst, designed to affect the bond between Parents and N.M. so that termination would be the natural outcome of the proceedings. This is an extremely harsh penalty for parents who have complied in every way with the requirements of the CPSL.

*In Int. of N.M.*, 186 A.3d at 1014 n.30.

- 6 -

Following remand, the trial judge recused herself. At a hearing held after a new judge was assigned, according to the Complaint, Langenbach continued to oppose reunification and kinship care. She also objected to Grandmother's presence in the courtroom. The court overruled this objection.

The court then removed Langenbach as GAL, finding she failed to act in Child's best interest. Child was placed in kinship care with Grandmother and, a short while later, reunited with Parents.

Appellants then instituted this suit. Parents brought legal malpractice claims against Langenbach and the Defender Association and IIED claims against Langenbach. Grandmother brought an IIED claim against Langenbach.

Langenbach and the Defender Association filed preliminary objections asserting judicial or quasi-judicial immunity. They also demurred to all claims. The trial court sustained the preliminary objection as to immunity and dismissed the claims. It alternatively found the demurrer to E.M.'s legal malpractice claims and Children's and Grandmother's IIED claims meritorious but overruled the demurrer as to Child's legal malpractice claim.

Children and Grandmother appealed. They raise the following issues:

1. Did the Trial Court err as a matter of law in finding that the Defendants are immune from suit based on quasi-judicial immunity or any other immunity?

2. Did the Court err as a matter of law in sustaining the preliminary objections on the basis of immunity and dismissing all claims in Appellants' complaint based on that immunity?

3. Did the Court err as a matter of law and/or abuse its discretion in finding that the Appellants failed to state a claim for Intentional Infliction of Emotional Distress?

4. Did the Court erred as a matter of law and/or abused its discretion in finding that Plaintiff, E.M., failed to state a claim for legal malpractice?

Children's Br. at 5.

In their first two issues, Appellants challenge the trial court's conclusion that Appellees had immunity from suit.[4] They allege that Appellees are not immune, as Pennsylvania law does not extend judicial or quasi-judicial immunity to attorneys acting as GALs in dependency proceedings. They further maintain the trial court should not have found immunity without guidance from the General Assembly, the Supreme Court, or this Court.

Appellees argue the trial court did not err in finding they were immune from suit. They claim that, because the GAL was acting as an arm of the court to support Child's best interest, the court correctly concluded Appellees were entitled to quasi-judicial immunity. They argue judges rely on GALs, who gather information and evidence and make recommendations, and claim that,

_____

[4] Immunity is an affirmative defense, which should be raised in New Matter in a responsive pleading, not preliminary objections. *See* Pa.R.C.P. 1030(a); *Soto v. Nabisco, Inc.*, 32 A.3d 787, 788 n.2 (Pa.Super. 2011). Appellants, however, did not raise the irregularity in preliminary objections to the preliminary objections, and thus waived it. *See Preiser v. Rosenzweig*, 614 A.2d 303, 305 (Pa.Super. 1992), *aff'd*, 646 A.2d 1166 (Pa. 1994). Although their answer to the preliminary objections argued immunity should have been raised in New Matter, they make no such claim on appeal. Therefore, Appellants have doubly waived any objection to the raising the defense of immunity in preliminary objections. *See Bloom v. Dubois Reg'l Med. Ctr.*, 597 A.2d 671, 675 n.4 (Pa.Super. 1991) (concluding that where an immunity defense "is raised by preliminary objections and this procedure is not objected to, the question of immunity from suit may be decided").

without immunity, courts may not receive the same degree of frankness from GALs. They further claim that the child welfare agency, medical expert, and the city solicitor are all entitled to immunity.[5] Appellees further cite cases from other jurisdictions where GALs were found to be immune.

Where a preliminary objection presents a question of law, such as whether a defendant is immune, our standard of review is *de novo*. Our scope of review is plenary. **See Heldring v. Lundy Beldecos & Milby, P.C.**, 151 A.3d 634, 641 (Pa.Super. 2016); **Feldman v. Hoffman**, 107 A.3d 821, 826 n.7 (Pa.Cmwlth. 2014).

We conclude the trial court erred in finding Appellees had immunity from this suit. In **Z.F.1 v. Bethanna**, the Defender Association of Philadelphia claimed it was immune because the "suit arose from actions taken while one of its attorneys was acting as a guardian *ad litem*." 244 A.3d 482, 494 (Pa.Super. 2020). We declined the invitation to create an immunity for GALs, where no existing statute, rule, or case law established such immunity in Pennsylvania. **Id.** at 494. We explained that "[i]t is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines." **Id.** (quoting **Matter of M.P.**, 204 A.3d 976, 986

---

[5] Kidsvoice, Montgomery Child Advocacy Project, Support Center for Child Advocates, Montgomery County Child Advocacy Unit, Bucks County Guardian *Ad Litem* Office, and 22 guardians *ad litem* from 18 additional counties filed an *amicus* brief, arguing that GALs are arms of the court and must be able to perform their function without fear of a lawsuit. They state that without immunity, GALs may hesitate to push an issue for fear of liability, and fewer attorneys may be willing to work as a GAL if immunity does not exist.

(Pa.Super. 2019). "Rather, the Superior Court is an error-correcting court and we leave policy questions to the Supreme Court and the General Assembly." *Id.* (quoting *Matter of M.P.*, 204 A.3d at 986).[6]

Here, as in *Z.F.1*, Langenbach and the Defender Association seek immunity from suit from actions taken by Langenbach while acting as a GAL. There has been no change in Pennsylvania law, and we again decline the invitation to create immunity for GALs where no such immunity exists in statute, rule, or case law.

Appellees attempt to distinguish *Z.F.1.*, noting that there, the defendant did not raise the immunity defense before trial but rather raised it for the first time in post-trial motions. They claim that appellate courts should be able to consider a quasi-judicial immunity issue, not just the Supreme Court or General Assembly. Their attempt to distinguish *Z.F.1* is not convincing. The Court in *Z.F.1* did not find waiver for failure to raise the issue before trial, and the timing of the raising of the issue was not a factor in the Court's decision on the immunity issue. Rather, we addressed the issue, finding that it was not proper for this Court to create an immunity for GALs, as explained above.

---

[6] *See also Commonwealth v. Dugger*, 486 A.2d 382, 386 (Pa. 1985) ("The formal purpose of the Superior Court is to maintain and effectuate the decisional law of this Court as faithfully as possible."); *Moses v. T.N.T. Red Star Exp.*, 725 A.2d 792, 801 (Pa.Super. 1999); *Commonwealth v. Montini*, 712 A.2d 761, 769 (Pa.Super. 1998) (Johnson, J., concurring), *quoted in Matter of M.P.*, 204 A.3d at 986; *Dominick v. Statesman Ins. Co.*, 692 A.2d 188, 192 (Pa.Super. 1997); *Malinder v. Jenkins Elevator & Machine Co.*, 538 A.2d 509, 513 (Pa.Super. 1988) (*en banc*). Other than *Z.F.1*, Appellees mention none of the authorities we cite on this point.

The cases the concurring and dissenting memorandum cites do not support its assertion that this Court and the Commonwealth Court have done many times what Appellees ask us to do here. Rather, those cases were instances of the intermediate appellate courts applying existing doctrines to new facts. Although Appellees facially argue for quasi-judicial immunity, **see** Appellees' Br. at 23, they do not truly claim immunity under any extant doctrine. They instead mix together aspects of judicial and quasi-judicial immunity, cite precedents from other jurisdictions, and point to the "rationale" for appointing GALs, to maintain that GALs ought to enjoy immunity from suit. **See id.** at 19-21, 23-28, 29-36. They in substance contend that immunizing GALs will enable them to perform their duties "absent influence, fear or intimidation from anyone." **Id.** at 34. In order to credit their arguments, we would have to balance competing interests and choose what we deem to be the "best" path. Appellees thus in reality pose a policy question, and resolving it is beyond this Court's "ken." Concurring and Dissenting Memorandum at 2.

In their third claim, Children and Grandmother argue the court erred in finding they failed to state IIED claims. On appeal from an order overruling preliminary objections in the nature of demurrer, our standard of review is *de novo*, and our scope of review is plenary. ***Palmiter v. Commonwealth Health Sys., Inc.***, No. 498 MDA 2020, 2021 WL 3507795, at *2 (Aug. 10, 2021). We "accept as true all well-pleaded allegations of material fact and all reasonable inferences deducible from those facts" and resolve all doubt "in favor of the non-moving party." **Id.** (quoting ***Commonwealth v. UPMC***, 208

A.3d 898, 904 (Pa. 2019)). We then ask whether, on the facts averred, the law says with certainty that no recovery is possible. *Id.* Whenever there is doubt about whether a demurrer should be sustained, the court should resolve it in favor of overruling the demurrer. *Id.*

Appellants claim that Langenbach "sought to intentionally destroy the family bond," which they argue "shocks the conscience of members of society." Appellants Br. at 22. They argue this Court recognized an action for IIED for interference with family bonds in *Bartanus v. Lis*, 480 A.2d 1178 (Pa.Super. 1984), where the Court found an IIED claim viable where defendants disparaged the father and spread lies about him to have the child return from living in Germany with his father. They claim that here, Langenbach was part of a two-year effort to remove Child from her family, and she did so in the face of a clear legal requirement that she should have advocated for kinship care. Her actions in arguing against kinship care and in support of termination, as well as other actions such as making disparaging comments at a parenting class and allegedly telling the judge after remand that she was "unaware why [Grandmother] was not visiting child," would "shock the conscience of any warm-blooded vertebrae [*sic*]." Appellants' Br. at 33. Appellants argue the allegations in the Complaint are sufficient at the pleading stage to allege an IIED claim.

"The gravamen of the tort of [IIED] is outrageous conduct on the part of the tortfeasor." *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987). A plaintiff must prove that the defendant "by extreme and

- 12 -

outrageous conduct intentionally or recklessly cause[d] severe emotional distress." *Id.* (quoting Restatement 2d of Torts § 46). The Commentary to Section 46 of the Restatement describes the conduct contemplated by the tort as follows:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* at 190-91 (citing Restatement (Second) of Torts § 46 comment d).

The trial court found Children and Grandmother failed to state an IIED claim against Langenbach:

> Ms. Langenbach's conduct, as described in plaintiffs' complaint, has already been found not to have been in the best interests of the child, but there are no facts alleged to support the level of extreme and outrageous conduct needed to support an intentional infliction of emotional distress claim. Plaintiffs' intentional inflections causes of action are therefore legally insufficient.

Trial Ct. Op., filed July 8, 2020, at 15-16.

We agree with the trial court. Taking the allegations in the Complaint as true, Appellants fail to state an IIED claim. They do not rise to the level of extreme and outrageous conduct sufficient to support the claim.

*Bartanus*, relied on by Appellants, is distinguishable. There, we concluded a father's complaint stated an IIED claim against his sister and her husband in relation to his son. There the father's sister and her husband cared for the father's son when the father was away on work assignments. *Bartanus*, 480 A.2d at 1183. After many years, the father proposed that his son live with him again. His sister "flew into a rage, calling [the father] names, using abusive language, and threatening bodily harm, in the presence of his son." *Id.* The sister's husband also "said foul things about [the father] and threatened him with bodily harm." *Id.* The sister and her husband tried to adopt the son without notifying the father, told the son that the father did not love him, prevented the son from visiting his relatives, and told the son that the father's house had rats. *Id.* After the son decided to live with father, the sister and husband "continually disparaged [the father], describing him as a whoremaster, liar, and con artist who really did not love his son." *Id.* They called the son and threatened to commit suicide if he did not return. They had the son write a note to his father that "he did not have long to live and that god would punish him." *Id.* The son became unhappy and returned to live with father's sister and her husband. The father maintained the conduct caused him severe emotional distress. We concluded that the father stated an IIED claim, noting the complaint "alleged intentional misrepresentations made

to an adolescent by his aunt and uncle concerning the morals and behavior of his father." *Id.* at 1185. We reasoned that "it appear[ed] that [the sister and her husband] intentionally manipulated appellant's son in a manner 'peculiarly calculated' to cause [the father] serious mental or emotional distress." *Id.*

Here, Child had been found dependent. Although Langenbach argued for termination and against kinship placement, her actions, in the context of a dependency proceeding, are not similar to the repeated disparagement of a father toward a son over the course of years and the threats of physical harm and suicide. Further, in contrast to *Bartanus*, the alleged comments made by Langenbach were in court or at a parenting class, not in front of Child.

In the fourth claim, E.M. argues the court erred in finding he did not state a legal malpractice claim against Appellees. He alleges he stated a claim for legal malpractice because he not only had an interest in being with his parents, but also with his sister. Further, he had an interest in visiting and seeing Child and doing so while Child was in Grandmother's care. He suffered losses due to Langenbach's efforts to destroy his sibling bond with Child. He argues that "[b]y advocating specifically against [kinship] placement, which is contrary to Pennsylvania law, and putting in motion a two-year effort to destroy E.M.'s bond with his sister even at [the] first hearing, Langenbach and, in turn, the Defender Association failed to live up to the professional standard of care as attorneys for E.M." Appellants' Br. at 28. He argues that the legal malpractice claim is for the loss he suffered "with respect to Langenbach's efforts and advocacy from the outset of her representation of

him and his sister to destroy their sibling bond." *Id.* That he was placed with his parents does not "absolve Appellees of liability." *Id.*

For a legal malpractice claim, a plaintiff must allege "(1) the employment of the attorney or other basis for duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) that such negligence was the proximate cause of damage to the plaintiff." *Rizzo v. Haines*, 555 A.2d 58, 65 (Pa. 1989) (citation omitted). Law firms are liable for negligent conduct performed by its attorneys within the scope of their employment. *Atkinson v. Haug*, 622 A.2d 983, 986 (Pa.Super. 1993).

The trial court concluded that E.M. failed to state a legal malpractice claim against Langenbach and the Defender Association:[7]

> An essential element of a legal malpractice claim is allegations "of actual loss." *Rizzo*, 555 A.2d at 68. Legal malpractice claims cannot be based on "speculative damages." *Id.* Ms. La[n]genbach was appointed as E.M.'s guardian ad litem before a July 7, 2016 hearing. (*Id.* at ¶ 23). At the conclusion of that hearing, he was reunited with his parents. (*Id.* at ¶1130-31). E.M. was discharged from dependent care at the subsequent August 18, 2016 hearing, and remained in his parents' custody. (*Id.* at ¶ 41). Plaintiffs' complaint contains no allegations that defendants' conduct in these hearings caused an actual loss. Therefore, the complaint fails to state a legal malpractice claim by E.M. against defendants.

Tr. Ct. Op. at 14-15.

We conclude the trial court did not err in finding E.M. failed to state a legal malpractice claim. Langenbach owed E.M. a duty while she was his child

---

[7] It found that Child did state a legal malpractice claim against Appellees.

advocate. However, this duty ended when E.M. was returned to Parents' care and no longer dependent. The attorney-client relationship from which the duty arose ended. The harm E.M. alleges, the destruction of the bond between him and Child, would have occurred due to a breach in Langenbach's duty to Child. Although Langenbach allegedly argued against kinship care for Child while still representing E.M., that alone would not be sufficient to support his claim of injury due to a breach of duty owed to him.

Order reversed. Case remanded. Jurisdiction relinquished.

Judge King files a concurring memorandum.

Judge Pellegrini files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/1/2022