J-A25016-23

2024 PA Super 13

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.M.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 467 WDA 2023 |

Appeal from the Order Entered March 24, 2023
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
13 of 2022

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

OPINION BY KUNSELMAN, J.:                    **FILED: JANUARY 22, 2024**

L.M. (Mother) wanted her two-year-old daughter, J.M.B. (the Child), to be adopted by the Child's godmother, S.W. (Godmother), with whom Mother would then co-parent.  J.B. (Father), who had been absent from the Child's life, consented to the proposed adoption and agreed to relinquish his parental rights.  However, the orphans' court denied Mother's petition after it concluded the proposed adoption was not authorized under the Adoption Act.  ***See generally*** 23 Pa.C.S.A. §§ 2101-2938.  Mother appealed.  After careful review, we affirm.

The simplicity of the facts belies the complex legal issues involved.  The Child was born in May 2020.  Mother and Father never married, but they resided together until their relationship ended around August 2021.  For a time thereafter, Father's whereabouts were unknown.  In November 2021,

_____

[*] Retired Senior Judge assigned to the Superior Court.

Mother filed a custody complaint and subsequently obtained sole legal and physical custody of the Child. In April 2022, Mother filed a petition to terminate Father's rights, identifying the Child's Godmother as the prospective adoptive parent.

Mother and Godmother have been friends since they were teens, and their families are very close. Godmother is a source of support for Mother. The Child refers to Godmother as an aunt, and the Godmother's husband, D.W., (also the Child's Godfather) as an uncle. Godparents have a child of their own. They live approximately 30 minutes away from Mother and the Child. The two families celebrate holidays and special occasions together.

In June 2022, Father purportedly agreed that the adoption would be in the Child's best interest, and he understood he would have to relinquish his parental rights. Mother then withdrew her petition to involuntarily terminate Father's rights, and in July 2022, Mother filed the instant adoption petition.

In August 2022, the orphans' court scheduled a status conference to address its concern that the proposed adoption was invalid. Following the status conference, the court directed Mother to brief the issue. Mother complied and the orphans' court scheduled a hearing, which was eventually held on February 27, 2023.

Mother appeared at the hearing with counsel. She offered her own testimony and that of Godmother, Godfather, and L.D.M. (Maternal Grandmother). All were in favor of the proposed adoption. Mother and Godmother said they understood the legal and financial ramifications of the

adoption; Godfather acknowledged Godmother would be as responsible for the subject Child just as she was for Godparents' own daughter. Mother explained that the reason for the proposed adoption was because she wanted the Child to be taken care of in the event of her untimely death. The court heard no testimony that Godmother or Mother intended to live together or combine households. Mother also testified that she is currently involved in a romantic relationship. Although a marriage was not anticipated at the time of the hearing, Mother testified that any potential marriage would not affect the proposed adoption.

After taking the matter under advisement, the orphans' court denied Mother's petition on March 24, 2023. Mother filed this appeal, wherein she presents the following two issues:

1. Whether the trial court erred and/or abused its discretion in applying **In re Adoption of M.R.D.**, 145 A.3d 1117 (Pa. 2016)?

2. Whether the trial court abused its discretion in failing to recognize both parents' agreement to the adoption of the child by [the] proposed adoptive parent [as] a "good cause" exception under 23 Pa.C.S.A. § 2901?

Mother's Brief at 6.

We address these issues contemporaneously because they pose the same question. Mother essentially challenges how the orphans' court applied the Adoption Act. Such a claim presents a pure question of law. Accordingly, our standard of review is de novo and our scope of review is plenary. **See,**

*e.g., M.R.D.*, 145 A.3d at 1126; *see also In re Adoption of M.E.L.*, 298 A.3d 118 (Pa. 2023).

Our Supreme Court has also held that part of the analysis in Section 2901 of the Adoption Act involves the lower court's discretion. *M.E.L.*, 298 A.3d at 127 (citing *In re Adoption of R.B.F.*, 803 A.2d 1195, 1202 (Pa. 2002) and 23 Pa.C.S.A.§ 2901). Thus, to the extent Mother also challenges the discretionary aspect of the orphans' court decision, we review for an abuse of discretion. Such a review requires appellate courts:

> to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The Adoption Act provides, rather succinctly, "Any individual may become an adopting parent." 23 Pa.C.S.A. § 2312. Notwithstanding this broad declaration, the Act imposes exacting substantive and procedural requirements necessary to support an adoption decree. *See Interest of K.N.L.*, 284 A.3d 121, 139 (Pa. 2022). These requirements "serve the critical broadscale function of scrutinizing the safety, wellbeing, and viability of the

resulting court-sanctioned, permanent parental relationship." *Id.* at 139. Relevant here, the Act requires *both* parents to relinquish their parental rights, either voluntarily or involuntarily. *See generally* 23 Pa.C.S.A. §§ 2501-2521, 2711(a)(3), (d)(1); *see also R.B.F.*, 803 A.2d at 1999. The purpose of the relinquishment requirement is to sever the legal ties between the child and the natural parents, thereby allowing the child to be adopted into a new family unit, where the child may then form new bonds with the new parents unencumbered by the former legal parents. *M.R.D.*, 145 A.3d at 1128.

However, the Adoption Act provides an exception to this relinquishment requirement in the context of stepparent adoptions. Under Section 2903 of the Act: "Whenever a parent consents to the adoption of his child by his spouse, the parent-child relationship between him and his child shall remain whether or not he is one of the petitioners in the adoption proceeding." 23 Pa.C.S.A. § 2903. "Adoption in such circumstances allows the prospective adoptive parent to create a new parent-child relationship with the legal parent's child and a family unit *together with* the co-parent to whom he or she is committed." *M.R.D.* at 1128. (emphasis original). Thus, because the legal parent and prospective adoptive parent are part of the same family unit, the relinquishment requirement is unnecessary, as it would undermine, rather than promote, family stability. *Id.*

Additionally, and central to the matter before us, the Adoption Act provides a cause exception to the relinquishment requirement under Section 2901:

> ***Unless the court for cause shown determines otherwise***, no decree of adoption shall be entered unless the natural parent or parents' rights have been terminated, the investigation required by section 2535 (relating to investigation) has been completed, the report of the intermediary has been filed pursuant to section 2533 (relating to report of intermediary) and all other legal requirements have been met. If all legal requirements have been met, the court may enter a decree of adoption at any time.

23 Pa.C.S.A. § 2901 (emphasis added)

Recently, our Supreme Court clarified the legal framework for those seeking to employ the cause exception. ***In re Adoption of M.E.L.***, 298 A.3d 118 (Pa. 2023). The process involves two steps:

> To satisfy the cause exception to the relinquishment under Section 2901 two things must be established. A party must first show why he or she cannot meet the statutory requirements for adoption. This is consistent with the plain language of the statute, which provides that, "unless the court for cause shown determines otherwise, no decree of adoption shall be entered unless…all other legal requirements have been met." 23 Pa.C.S. § 2901. … Upon this showing, the party may then appeal to the court's discretion by demonstrating with clear and convincing evidence why the purpose of Section 2711(d) would nevertheless be fulfilled or unnecessary in their case, despite the party's inability to fulfill the statutory requirements.

***M.E.L.***, 298 A.3d at 127 (cleaned up).

In other words, the Court determined that when a party wants to retain their parental rights in a second-parent adoption, the party must first establish why they cannot meet the statutory requirements for a stepparent adoption. Only then could the party appeal to the court's discretion to claim that the proposed adoption would satisfy the underlying purpose of the Adoption Act.

In *M.E.L.*, a mother wanted her child to be adopted by her partner. The mother and the partner were not married but were in a committed relationship. In fact, they shared another child together (the subject child's half-sibling), and the subject child called the partner "dad." The mother claimed that the proposed adoption would satisfy the purpose of the relinquishment requirement, because the adoption would formalize their family unit. However, the mother did not first explain why she and her partner could not marry. Without this, the Court said the mother skipped the first step of the two-step process and "put the proverbial cart before the horse." *M.E.L.*, 298 A.3d at 127-28. The Court remanded the matter for further proceedings.

With these principles in mind, we turn to the facts of the instant appeal. Applying *M.E.L.*'s two-step process, Mother had to first explain why she was unable to meet the statutory requirements – *i.e.*, why she and Godmother were unable to marry. Mother and the orphans' court did not have the benefit of the *M.E.L.* decision, and thus Mother advanced no explanation, nor did the court inquire. Here, we do not need to remand, as the Court did in *M.E.L.*, because the reason why Mother and Godmother cannot meet the statutory

requirements is self-evident. Godmother and Mother are unable to marry, because Godmother is still married to her husband and any subsequent marriage to Mother would be illegal and void. **See** 18 Pa.C.S.A. § 4301 (Bigamy); **see also** 23 Pa.C.S.A. § 3304(a)(1) (Grounds for annulment of void marriages).

When the answer to the first step of the cause exception inquiry is self-evident, **M.E.L.** indicates that the court may move directly to the second step. **See M.E.L.**, 198 A.3d at 128 ("Indeed, while our Court's analysis in **R.B.F.** and **M.R.D.** centered more directly only the second portion of the [cause exception] inquiry…that was because there was no question that the domestic partners in **R.B.F.**, and the mother and grandfather in **M.R.D.**, were legally prohibited from marrying and, thus, could not satisfy the statutory requirements for adoption.").

The second step of the cause exception inquiry is whether the proposed adoption satisfies the underlying purpose of Section 2711(d), thereby rendering the relinquishment requirement unnecessary. **Id**. "The purpose behind the termination or relinquishment of an existing parent's rights prior to an adoption is to facilitate a 'new parent-child relationship' between the child and the adoptive parent, and to protect 'the integrity and stability of the new family unit.'" **M.R.D.**, 145 A.3d at 1128-29 (citing **In re B.E.**, 377 A.2d 153, 156 (Pa. 1977); **In re Adoption of J.D.S.**, 763 A.2d 867, 871 (Pa. Super. 2000); **In re Adoption of L.J.B.**, 18 A.3d 1098, 1108 (Pa. 2011)). Thus, the essential question is whether Mother's proposed adoption of the

Child by Godmother will promote a new parent-child relationship within a new family unit. The decisional case law provides an example of when the underlying purpose of the relinquishment requirement is satisfied, and when it is not.

In *R.B.F.*, same-sex domestic partners could satisfy this underlying purpose. Although the couple could not meet the stepparent exception under Section 2903, because the law at the time prohibited same-sex marriage, the High Court ruled that these couples could employ the cause exception under Section 2901. The same-sex couple had to show that their proposed adoption would accomplish what a stepparent adoption would accomplish – namely, the protection of a new family unit, and the fostering of a new parent-child relationship. If they were able to prove this, then the relinquishment requirement would be unnecessary (just as in stepparent adoptions), and cause would be established. *See R.B.F.*, 803 A.2d at 1203.

> [I]n second-parent adoption cases in which the relinquishment of a parent's rights is not required – *i.e.*, stepparent adoptions and adoptions by same-sex couples – relinquishment of the parent's rights is unnecessary, and indeed damaging. In such cases, the parent and the prospective adoptive parent are committed partners – that is, they are involved in a horizontal relationship, are equals as between each other, and are equals with respect to the child. Adoption in such circumstances allows the prospective adoptive parent to create a new parent-child relationship with the legal parent's child and a family unit ***together with*** the co-parent to whom he or she is committed. Thus, because the legal parent and prospective parent in second-parent adoption cases are part of the same family unit, the relinquishment requirement undermines, rather than promotes, family stability.

***M.R.D.***, 145 A.3d at 1128 (emphasis original).

By contrast, in ***M.R.D.***, a mother and maternal grandfather could not satisfy the underlying purpose of the relinquishment requirement. The Supreme Court observed that the mother, the child, and the grandfather did not plan to live together as a family unit following the proposed adoption. The grandfather would continue to live separately with his spouse, the grandmother. On these facts, the Court held: "Adoption does not foster a family unit under circumstances where, as here, the adopting party is already part of – and will continue to be part of – [a] family unit that is separate from the unit which [the proposed adoptive parent] seeks to promote and join through adoption." ***M.R.D.***, 145 A.2d at 1128. Moreover, the mother and the maternal grandfather would not have been equals between each other or equals with respect to the child. ***See id.*** at 1128-29. Their relationship would not have been horizontal, but a problematic hybrid relationship where the grandfather would be simultaneously the parent and the grandparent of the child. All these factors contributed to the Court's conclusion that mother did not meet the cause exception.

As in the above examples, Mother here was unable to meet the statutory requirements for a stepparent adoption, but she could appeal to the orphans' court's discretion to claim why an adoption by Godmother would nevertheless facilitate a new parent-child relationship and protect the integrity and stability of the new family unit. ***See M.E.L.***, 298 A.3d at 127. For its part, the orphans' court had discretion to determine whether Mother met the criteria, by clear

and convincing evidence, but the court was still bound to our precedents. *See id.*

Most importantly, the orphans' court determined that Mother and Godmother had no intention of living together as a "new family unit," as contemplated by *M.R.D.* *See* Memorandum Opinion, 3/24/23, at 3; *see also* Orphans' Court Pa.R.A.P. 1925(a) Opinion, 5/19/23 (O.C.O.), at 4. Thus, in the court's discretion, it determined that Mother did not meet the cause exception under 23 Pa.C.S.A. § 2901. *See* O.C.O. at 4-5. The orphans' court determined that Mother's motivating factor for the proposed adoption was to ensure the Child would be cared for in the event of Mother's untimely death.[1]

On appeal, Mother presents several arguments challenging the decision of the orphans' court, and we address those claims in turn. Notably, however, Mother's Brief is largely silent to the court's substantive determination that the proposed adoption would not promote a new family unit. This is the critical finding, for it means that the proposed adoption does not satisfy the underlying purpose of Section 2711(d)'s relinquishment requirement. As

---

[1] The orphans' court noted that Mother was not ill, nor did she face any life-threatening ailments that she knew of. The court distinguished Mother's case from our Supreme Court's decision *In re Adoption of C.M.*, 255 A.3d 343 (Pa. 2021). *C.M.* also involved a mother who proposed that her child be adopted by family; the mother in that case suffered from several diseases. *C.M.*, 255 A.3d at 349. We clarify, however, that *C.M.* is distinguishable from the instant case not because the mother in *C.M.* was unwell, but because that mother voluntarily relinquished her parental rights, which meant that the statutory requirements were fulfilled, and the proposed adoption could proceed. *Id.* at 360-361. Here, by contrast, Mother sought to retain her rights, setting the analysis on a different trajectory.

such, Mother cannot establish cause, and the orphans' court could not authorize the proposed adoption under the Act. Our review must begin with the court's determination that Mother and Godmother were not part of a "family unit."

During the hearing, Mother referred to herself, Godmother, and Godfather as "a family unit." N.T., 2/27/23, at 14. Mother agreed with counsel's suggestion that the proposed adoption "would be a formalization of a family unit that has already been created." *Id.* at 15. Godmother similarly testified that she considers everyone – Godfather and her daughter, as well as Mother and the subject Child – to be "just one big family." *Id.* at 34. Counsel for Mother asked of Godfather, "Do you recognize that this is a kind of unorthodox family unit?" *Id.* at 42. Godfather said that he does, and that he came from an "unorthodox family unit" as well, and that "family is not always blood." *Id.* at 42. Maternal Grandmother testified that Mother and Godmother are family. *Id.* at 51.

We do not to disparage the assertion that Mother and Godmother are family. Nor do we define the outer parameters of what constitutes a family. We recognize the sentiment – indeed, the legal reality – that "family is not always blood." We note that our courts have been particularly sensitive to the plight of single parents, as well as society's changing notion of what it means to be a family. *See M.E.L.*, 298 A.3d at 129. To that end, we echo the orphans' court's admiration of Godparents and the care and support they have shown Mother.

Nevertheless, when it comes to adoption law, the phrase "family unit" is a legal term of art. That term exists in the context of the relinquishment requirement, which reflects our General Assembly's clear goal of promoting adoptions by a spouse, in the context of an intact marriage, and "'rooted in the belief that children benefit from permanency,' the best indicator of which 'is to have children parented by two parents in a permanent relationship – a marriage.'" **M.E.L.**, 298 A.3d at 128 (quoting **M.R.D.,** 145 A.3d at 1131-32 (Baer, J., concurring). Of course, the Adoption Act anticipates there could be instances where the two adults in the "family unit" cannot get married, for whatever reason. The Act does not put form over substance by barring these individuals from adopting. Rather, the Act acknowledges that integrity and stability of their family unit might still warrant protection, even though the couple are unable to marry. Hence, the cause exception under Section 2901.

But testifying that one is in a "family unit" does not make it so. The record supports the orphans' court determination that there are two family units in this case. Godmother lives with her husband and her daughter. That is its own family unit. Approximately 30 minutes away, Mother and her Child live together in their own, separate unit. Godmother and Mother have no intention of combining their families under one roof and raising the Child in one household. As the High Court made clear in **M.R.D.,** "[a]doption does not foster a family unit under circumstances where, as here, the adopting party is already part of – and will continue to be part of – [a] family unit that is separate from the unit which [the proposed adoptive parent] seeks to promote

- 13 -

and join through adoption." **M.R.D.**, 145 A.2d at 1128. In this respect, the matter before us is hardly different than **M.R.D.**

Mother nonetheless maintains that they are in a family unit, comparing their circumstances to that of a child with divorced parents. Mother reasons that the subject Child would simply have two parents who live in separate homes. And like divorced parents, the subject Child's prospective adoptive parent (Godmother) lives with her spouse and the daughter they share – not unlike a stepfamily. Mother's position is logical, but it does not conform with our Supreme Court's prior holdings. The High Court has made clear that the cause exception exists to protect **intact** family units. **See M.R.D.**, 145 A.3d at 1128; **M.E.L.**, 298 A.3d at 128. Neither the Court, nor the General Assembly, has broadened the cause exception to the extent that Mother advocates.

In addition to not creating a family unit, the proposed adoption fails another part of the **M.R.D.** analysis – namely, it does not create a truly equal co-parent relationship. **See M.R.D.**, 145 A.3d at 1128 (providing that the parent and prospective adoptive parent shall be "equals as between each other and [] equals with respect to the child"). During the hearing, Mother and Godmother testified that they understood the effect of the adoption meant they would become co-parents, that they would have equal rights to the Child, as well as equal responsibility to support the Child, both financially and otherwise. For good measure, Godfather also testified that he understood his wife would have a duty to the Child, just as she has a duty to their daughter.

Notwithstanding these averments, however, the record indicates that Mother did not intend for Godmother to be an equal co-parent. Mother only proposed the adoption to ensure Godmother obtains custody in the event of Mother's untimely death. As such, the testimony provided by Mother and Godmother suggest a parental hierarchy – namely, that Mother would proceed as the sole caregiver, and that Godmother would be the emergency backup if and when Mother cannot parent the Child herself. This hierarchy is not the equal relationship akin to stepparent adoptions under Section 2903, or second-parent adoptions under **R.B.F.** Moreover, the hierarchy described below only further demonstrates that Mother and Godmother are part of separate family units.

The record indicates that Mother was, and would continue to be, the **sole** decision maker – *i.e.*, have sole legal custody. Counsel asked Mother whether Godmother had been part of decisions regarding the Child, and whether Mother talks to Godmother prior to making decisions about the Child's health and education. **See** N.T. at 9. Mother indicated that she turns to Godmother for advice, but that the decision is ultimately hers.

> Mother: Yeah. Frequently, you know, if [the Child] has been ill through growing up [*sic*[2]] or if I had, you know, a parental concern with a behavior she's doing or, you know, if I'm worried that I'm handling these concerns appropriately, I lean on [Godmother] for

---

[2] In an apparent typo, Mother presumably said, "or throwing up."

> *advice*, you know, if ***I'm making the right
> call***.

***Id.*** (emphasis and footnote added).

Counsel asked Mother whether she and Godmother had discussed parental responsibilities and what would change if Godmother became a co-parent. Mother's answer suggested that Godmother would continue in her role as a support figure.

> Mother:     It would. I think the biggest focal point is the legality of it. You know, should, God forbid, anything ever happen to me and I'm unable to fulfill my parental duties, it's very important to me that somebody who would raise my child in good faith and teach her the way that I would want to be taught respect and to have manners, and have a home that is full of love, and I feel strongly that [Godmother] would provide that for her. And I also feel strongly that [Godmother] would hold me accountable to continue doing so. We would continue to do that together.

***Id.*** at 12-13.

In addition to legal custody, Mother would continue to retain sole physical custody of the Child, until such time as Mother needed assistance from Godmother. Counsel asked Mother whether Godmother participated in the physical care of the Child:

> Mother:     [Godmother] is helpful with childcare. She has helped whenever I've been ill. She would be sure to come and take care of [the Child], make sure that we have food in our refrigerator if I'm unable to, you know, go out obviously because of illness. Any time that I've not been well she's always been,

- 16 -

> you know, at the front door ready to help and take care of [the Child] ***so that I can recover and resume*** that."

***Id***. at 11 (emphasis added).

Counsel questioned Mother whether she understood the legal ramifications of adoption, noting that Godmother would be permitted to seek custody. ***See id.*** at 13. Mother answered in the affirmative, but even then, Mother suggested that Godmother would not be an equal co-parent, but an emergency back-up.

> Mother: So I fully understand that if I would ever make bad choices in life that [Godmother] would step up and make sure that I, you know, got better, and if I wasn't, that she would take full custody.
>
> […]
>
> We've [Mother and Godparents] made sure that everything is very clear and up front about, you know, should I fail my duties as a parent, that [Godmother] would resume full custody, financially and physically.

***Id.*** at 13-14; ***see also id*** at 16.

The orphans' court questioned Mother about how any future marriage on her part would affect Godmother's adoption, assuming it was granted. Mother indicated that Godmother would still be the Child's "guardian," which caused the court to hesitate. ***Id.*** at 17.

> The court: You recognize, though, that if the court were to grant this request that this adoption be able to proceed, that [Godmother] would be

> more than just a *guardian*? She would have all the rights that you do as a *parent* –

Mother:        Correct.

The court:     -- to your daughter? You're aware of that?

Mother:        Yes, sir.

*Id.* (emphasis added).

Mother's counsel understood the court's concern, and elicited testimony that Mother merely conflated parenthood with guardianship because she was unfamiliar with the legalese. *Id.* at 19. We appreciate that. But in the process of explaining further, Mother's testimony indicated that Godmother would not serve as a parent in a day-to-day capacity; that the reason for Godmother's adoption was so that the Child has "a stable parent growing up that is here and is there *for all of the big things* and all of the birthday parties and all of the – all of the moments that kids cherish." *Id.* at 18 (emphasis added).

Finally, at the end of her examination, Mother reiterated the primary reason she sought the adoption was to have an emergency caregiver ready:

> Mother:        I think my biggest goal is to know that my child will land in someone's arms who has an open heart to them since Day One and has provided that structure and knows her likes, her dislikes, you know, the things that make her tick and the things that aren't so great for her. Somebody who, you know, can continue to allow her to have the horse that she has. Someone who can continue to teach her morals and ethics that, you know, are understood that I would want her to be taught. I think that's just my biggest push at this point in time.
>
> […]

- 18 -

> Should anything happen to me she is going to have a home that is set up, you know, for her to walk right into that she's familiar with, that they know everything about her, and that they're aware of, you know, her path, her future goals and things that I would want for her. Those things would absolutely be met if she – if she were to go and have to, you know, live with [Godmother], they would continue to instill that for her.

*Id.* at 21-22.

Notably, Godmother also alluded to an unequal, parental hierarchy. When Mother's counsel asked Godmother what would happen if Mother got married and the Child had a new stepfather, Godmother suggested that she would defer to Mother.

> Godmother: Yeah. So I know that [Mother] kind of favors, like, the stability end of things, and I have been in [the Child's] life since Day One. ***And if, you know, that was wanting to be continued, that is totally fine with me.*** I've also told her, though, like in the future, you know, if she saw her significant other as someone she was going to end up marrying and that did happen and down the road they ended up married and she was comfortable and life changes, things change, ***and she wanted to revisit things, that I wouldn't be opposed***.

*Id.* at 33 (emphasis added).

It is unclear what Godmother meant by "revisit." If the adoption was granted, Godmother's parenthood could not be revisited. Elsewhere in her testimony, Godmother also seemed to recognize that she would play an important supportive role, but not be a co-parent in her own right:

Godmother: Any time that [Mother] need[s] a helping hand I try to be there. I know, like, there has been a couple instances where [Mother] or [the Child] or both of them have been sick, and I stop in. I bring groceries, drop off whatever they may need.

*Id.* at 26

Godmother testified that the proposed adoption would not change this dynamic.

The court: […] would it be any different whether you were an adoptive parent or whether you remained godmother and a good friend of [the Child] and [Mother]?

Godmother: ***I don't feel that much would really change*** regardless of the circumstance. Just kind of a relationship that [Mother] and I have and [the Child] and I have. Like I – I just always ***am there to support her, as is she with my family.***

*Id.* at 35 (emphasis added).

These excerpts demonstrate that the proposed adoption would not create the equal parent-child relationship that the ***M.R.D.*** Court envisioned. They also illustrate that Mother and Godmother are part of separate family units and would continue in their separate units following the proposed adoption.

On appeal, Mother attempts to distinguish ***M.R.D.*** According to Mother, ***M.R.D.*** does not apply, because Father here voluntarily relinquished his rights (whereas the father in ***M.R.D.*** did not). We agree that this distinction is important. Much of the second-parent adoption jurisprudence involves one

- 20 -

parent, seeking to **involuntarily** terminate the rights of the other parent. Our courts are wary of these types of cases for fear that the petitioner-parent's true motivation is to remove the other parent from the child's life, and that the proposed adoption is merely the vehicle to do so. **See In re Adoption of L.J.B.**, 18 A3d 1098, 1110 (Pa. 2011) ("[T]he creation of parental termination absent stepparent adoption would provide parents with a new, and in our view dangerous, tactic in heated custody disputes; indeed one can imagine routine cross-petitions for termination as part of custody battles[.]"); **see also M.R.D.**, 145 A.3d 1117, 1129 ("Given that the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, we must ensure that we do not open the floodgates to such gamesmanship.") (quotations and citation omitted).

Because Father consents to the proposed adoption, some of these fears are allayed. However, Father's consent does not have the impact on this case that Mother thinks it should. His consent is necessary to Mother's proposed adoption, but that alone does not suffice. The Adoption Act requires that **both** parents relinquish their parental rights, either voluntarily or involuntarily, or that the non-relinquishing parent meet an exception under Section 2901 or 2903. Father's consent, then, is merely part of the equation. At issue here is Mother's part – whether she can invoke the cause exception so she may be excused from her relinquishment requirement.

Although the **M.R.D.** Court may have suspected that the mother only sought the proposed adoption once the father came back in the children's

lives, this was not the reason the Court denied the proposed adoption. After all, the Supreme Court said "there is little question" that mother and maternal grandfather have established grounds for involuntary termination. *Id.* at 1126. The reason the Court denied the adoption was that the mother failed to demonstrate cause under Section 2901– *i.e.*, that the proposed adoption would facilitate a new parent-child relationship and protect the integrity and stability of a new family unit (discussed *supra*). Similarly, in *M.E.L.*, the Supreme Court noted that "there is no dispute that [the involuntary] termination of [father's] parental rights would be appropriate[.]" *M.E.L.*, 298 A.3d at 126. There too, however, the Court declined to sanction the proposed adoption. Thus, *M.R.D.* certainly applies to the instant matter, regardless of Father's consent.

As a final argument, Mother claims the court's denial violated her constitutional rights. Mother claims that the orphans' court had no authority to deny the proposed adoption, because she and Father had a fundamental right to make decisions regarding the custody, care, and control of their Child. *See* N.T. at 3; *see also generally* Mother's Brief at 20-24 (citing *D.P. v. G.J.P.*, 146 A.3d 204 (Pa. 2016) and *Troxel v. Granville*, 530 U.S. 57 (2000)); *and see* U.S. CONST. amend. XIV, § 1 (forbidding states from depriving "any person of life, liberty, or property, without due process of law," or from denying to any person within their jurisdiction "the equal protection of the law"). Mother asserts that "if the Court does not find that the parents'

agreement is 'good cause' then the constitutionality of Section 2901 must be questioned." **See** Mother's Brief at 19-20.

We are unpersuaded by Mother's constitutional argument. Preliminarily, we doubt whether Mother's rights to make decisions regarding the custody, care, or control of her Child are even at issue. This case is really about **adoption** and whether Godmother, as a third-party, can acquire parental rights to Mother's Child. Our Supreme Court has repeatedly held that adoption is a right conferred solely by statute. **See, e.g., R.B.F.**, 803 A.2d at 1199; **see also M.R.D.**, 145 A.3d at 1120; **and see M.E.L.**, 298 A.3d at 121. It is not a right that parents can simply transfer at their own discretion without court approval. The Adoption Act requires parents to strictly comply with all pertinent provisions, before the court may sanction a new, permanent relationship with a second parent. **See K.N.L.**, 284 A.3d at 139-40.

Assuming Mother's parental rights are implicated, she mistakenly believes that those rights are unfettered, ignoring the fact that the government may infringe upon individual rights – including parental rights – when the infringement is narrowly tailored to advance a compelling state interest. **See, e.g., In re D.C.D.**, 105 A.3d 662, 676-77 (Pa. 2014) ("[I]t is beyond cavil that the protection of children, and in particular the need to provide permanency for dependent children, is a compelling state interest."); **see also Hiller v. Fausey**, 904 A.2d 875, 886 (Pa. 2006) ("The compelling state interest at issue in this case is the state's longstanding interest in protecting the health and emotional welfare of children); **and see D.P.**, 146

A.3d at 211 ("The component of the government's *parens patriae* responsibility implicated here is its interest in ensuring that children are not deprived of beneficial relationships with their grandparents."). Surely the government has a compelling state interest when an individual seeks to relinquish parental rights and a third-party seeks to acquire those rights. Our Courts have essentially said as much when they held that adoption is a statutory right.

Ultimately, however, we decline to address Mother's constitutionality argument.[3] We conclude that this issue is waived due to Mother's failure to develop the argument. **See** Pa.R.A.P. 2119(a)-(b); **see, e.g., Zabrosky v. Smithblower-Zabrosky**, 273 A.3d 1108, 1121 n.4 (Pa. Super. 2022). Mother provides no argument to support her constitutional attack. She does

---

[3] If Mother intended to argue that Section 2901 of Adoption Act is facially unconstitutional, then she had an obligation to provide notice of this claim to the Attorney General or the claim is waived. **See** Pa.R.C.P. 235; **see also** Pa.R.A.P. 521(a); **and see Tooey v. AK Steel Corp**, 81 A.3d 851, 876 (Pa. 2013). This Court has extended this practice to proceedings involving the Adoption Act. **See in re Adoption of K.E.G.**, 2023 WL 6620329, at *5 (Pa. Super. 2023) (non-precedential decision) (finding that a party's failure to comply with either Rule 235 or Rule 521(a) resulted in waiver of all constitutional claims); **A.F. v. E.B.V.,** 2020 WL 734045, at *3 (Pa. Super. 2020) (non-precedential decision) (same); **but see County of Bucks v. Cogan**, 615 A.2d 810, 812-13 (Pa. Cmwth. 1992) (holding that notice to the Attorney General is only required when a facial constitutional challenge is made, and not where the allegation is that the statute as applied to the litigant works as an unconstitutional deprivation of due process rights).

Assuming Mother merely presents an "as applied" challenge, we would still conclude that she waived the issue.

not address whether, and how, strict scrutiny is triggered. She does not argue that the Adoption Act is insufficiently tailored to advance a compelling state interest. She does not clarify whether her claim amounts to a due process challenge, or equal protection challenge, or both. Simply block-quoting pages of parenthetical citations from a landmark parental rights decision does not make an argument as to how Section 2901 is unconstitutional as applied to her case. *See* Mother's Brief at 20-22 (citing *Troxel*, *etc.*).

As a final note, we do not think Mother's motivations for the proposed adoption were inherently unreasonable or otherwise nefarious. Mother, a single parent, merely sought for her Child what all children deserve – and what our body of family law seeks to guarantee – the stability and security of the Child. However, the current state of our adoption law does not provide her a means to achieve this adoption under these facts.

Our Supreme Court has issued several decisions in recent years articulating the confines of the Adoption Act. The High Court emphasized that the judiciary is bound by the provisions of the Adoption Act, including the spousal and relinquishment requirements, until such time as they are revisited by the General Assembly. For our part, we underscore our role as an intermediate appellate court. "The Superior Court is an error correcting court, and we are obliged to apply the decisional law as determined by the Supreme Court of Pennsylvania." *Matter of M.P.*, 204 A.3d 976, 986 (Pa. Super. 2019) (internal quotations and citation omitted). "It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand

existing legal doctrines." *Id.* Such is a province reserved to the Supreme Court and to the General Assembly. *Id.*; *see also, e.g., Z.F.1 by & through Parent v. Bethanna*, 244 A.3d 482, 494 (Pa. Super. 2020).

To conclude, the orphans' court did not commit an error of law when it applied the Adoption Act, as interpreted by our decisional case law. The record supports the court's decision that Mother's proposed adoption does not satisfy the purpose of the Adoption Act's relinquishment requirement, because the proposed adoption would not create a new parent-child relationship, nor would it protect the integrity and stability of a new family unit. Thus, the court acted within its discretion when it ruled Mother did not show cause under Section 2901 of the Adoption Act.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 1/22/2024